# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| DANIEL BUCHANAN, as Personal Representative of the Estate of Michael Buchanan, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil No. 04-26-B-W |
| STATE OF MAINE, et al. | ) ) | |
| Defendants. | ) | |

## ORDER ON STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On February 25, 2002, Deputy Kenneth Hatch shot and killed Michael Buchanan. This law suit tests the legal implications of his death.[1] Concluding there are no genuine issues of material fact with respect to Counts II, VI, and VII of the Third Amended

---

[1] This Court has issued four decisions on this case. *Buchanan v. Maine*, 377 F. Supp. 2d 276 (D. Me. 2005); *Buchanan v. Maine*, 366 F. Supp. 2d 169 (D. Me. 2005); *Buchanan v. Maine*, No. Civ. 04-26-B-W, 2004 WL 2538387 (D. Me. Nov. 9, 2004) (Magistrate Judge Kravchuk); *Buchanan v. Maine*, No. Civ. 04-26-B-W, 2004 WL 2457796 (D. Me. Nov. 2, 2004) (Magistrate Judge Kravchuk). By Order dated March 3, 2005, this Court dismissed Count I of Plaintiff's First Amended Complaint and Counts II and III, except to the extent they alleged an equal protection violation against Defendants Gilbert and Edmonson. *Order Affirming in Part and Rejecting in Part the Recommended Decisions of the Magistrate Judge and Granting Plaintiff's Motion for Leave to Amend Complaint* (Docket # 65). It also granted summary judgment on Counts VIII, IX and X to the extent those counts were directed against Lincoln County and Sheriff Brackett in his official capacity and dismissed Counts IV, V, and VI, except to the extent they alleged a Fourth Amendment excessive force violation. *Id.* The Plaintiff's original complaint was inartfully drafted and his First Amended Complaint made some non-controversial changes. *Complaint* (Docket # 1); *First Amended Complaint* (Docket # 32). But, the Second Amended Complaint made some substantive changes and drew a motion to strike from the Defendants. *Second Amended Complaint* (Docket # 46); *Motion to Strike Plaintiff's "Second" Amended Complaint* (Docket # 47). In addition, the Second Amended Complaint, perhaps in anticipation of a general affirmance of the Recommended Decision, dropped a count in the First Amended Complaint that this Court concluded survived the motion to dismiss. *See Order on Motion to Strike* at 3, n.4 (Docket # 64). The combination of multiple filings and rulings left the pleadings in chaos. To clear up the confusion, this Court granted the motion to strike, but allowed the Plaintiff in effect to start afresh and file a Third Amended Complaint that conformed to the rulings of the Court. *Id.* It is the allegations in the Third Amended Complaint which are now before the Court. *Third Amended Complaint* (Docket # 69).

Complaint, this Courts GRANTS the State Defendants' Motion for Summary Judgment (Docket # 108) in its entirety.[2]

## I. STATEMENT OF FACTS

### A. Michael Buchanan

Michael Buchanan, the second of eight siblings, was born in 1940.  *State Defendants' Statement of Material Facts* (DSMF) ¶ 1.  In the early 1970s, Mr. Buchanan began exhibiting signs of mental illness and was eventually diagnosed with schizo-affective disorder.  *Id.* ¶ 2; *Plaintiff's Statement of Additional Material Facts* (PSMF) ¶ 2.  The defining characteristic of this disorder is that, even in the absence of manic or depressive symptoms, an individual exhibits peculiarity, oddity, and disorganized thought.  PSMF ¶ 3.  Individuals with schizo-affective disorder also exhibit symptoms associated with schizophrenia and bi-polar disorder.  *Id.* ¶ 10.

Mr. Buchanan moved to Maine in approximately 1978.  DSMF ¶ 3.  He lived in Somerville in a house he built with help from a brother and a friend.  *Id.* ¶ 4.  Other than the beginning of his time in Maine, Mr. Buchanan lived alone.  *Id.* ¶ 5.  His house was situated at the end of a ½ to ¾ mile driveway, often impassable by a standard vehicle, and visitors were frequently required to walk the length of the driveway to reach Mr. Buchanan's house.  *Id.* ¶ 6.

Mr. Buchanan was twice committed involuntarily to the Augusta Mental Health Institute (AMHI):  first in 1988 and then from September 11 to October 19, 1999.  *Id.* ¶ 7. The basis for Mr. Buchanan's 1999 admission to AMHI was his threat to shoot a store

---

[2] This Order addresses the so-called State Defendants' Motion for Summary Judgment.  This Court is also issuing a separate Order addressing the County Defendants' Motion for Summary Judgment (Docket # 81). The "State Defendants" are Lynn Duby, individually and in her official capacity; John Nicholas, in his official capacity only; Julianne Edmonson, in her individual capacity only; and, Joel Gilbert in his individual capacity only.

clerk after learning the price of cigarettes had increased.  *Id.* ¶ 8.  As a result of his AMHI admissions, Mr. Buchanan became a member of the "AMHI class."  *Id.* ¶ 9.

### B.  The AMHI Class Action Lawsuit and the Consent Decree

The "AMHI class" denotes a class of plaintiffs certified by the Maine Superior Court in a class action lawsuit filed on February 27, 1989.[3]  *Id.* ¶ 10.  The lawsuit alleged the state of Maine was violating certain state laws and various provisions of the state and federal constitutions in its treatment of patients at AMHI.  *Id.* ¶ 11.  On August 2, 1990, the class action lawsuit was resolved through a Settlement Agreement incorporated into a Consent Decree.  *Id.* ¶ 12.  Pursuant to their terms, the state agreed to develop systems and provide various health care services to class members.  *Id.* ¶ 14.

The Settlement Agreement contains numerous provisions regarding the delivery of services to class members.  *Id.* ¶ 16.  Most relevant are paragraphs 49-83 relating to Individualized Support Plans (ISP).[4]  *Id.*; *Plaintiff's Opposition to State of Maine Defendants' Statement of Uncontested Material Facts* (PODSMF) ¶ 16.  An ISP is a written document prepared by a team, including the class member; it assesses the class member's strengths and needs, describes goals and objectives, and sets forth services

---

[3] The class action is styled, *Bates v. Grover,* KENSC-CV-89-88 (Me. Super. Ct., Ken. Cty.).  It remains pending.  Under the terms of the Consent Decree, the "AMHI class" consists of "all persons who on or after January 1, 1988 were patients at the Augusta Mental Health Institute and all persons who will be admitted to the Augusta Mental Health Institute in the future."   DSMF, exh. B ¶ 3.

[4] In addition to the provisions relating to ISPs, Plaintiff contends Paragraphs 6, 15, 32, 84-100, 103-104, and 112 of the Settlement Agreement are relevant to this decision.  Paragraph 6 relates to the allegations of the complaint; ¶ 15 defines the terms used in the Settlement Agreement; ¶ 32 relates to the principles governing the State in its development and administration of a comprehensive mental health system to meet class members' needs; ¶¶ 84-100 relate to class members' access to community resources, services, and programs; ¶¶ 103-104 relate to class member treatment options; and, ¶ 112 relates to standards for community programs and is applicable to agencies funded or licensed by the Department of Mental Health and Mental Retardation for the provision of community mental health services.  DSMF, exh. A ¶ 73.  This Court concludes that although ¶ 32 is relevant in determining the propriety of forced treatment, the additional provisions have no bearing on the disposition of the State Defendants' Motion for Summary Judgment.

necessary to meet them.  DSMF ¶ 18; PODSMF ¶ 18.  The Settlement Agreement declares that every class member, upon discharge from AMHI, is entitled to receive an ISP, and to have the ISP coordinated and monitored by a community support worker. DSMF ¶¶ 17, 19.  Class members, however, are not required to accept the assistance of a community support worker.[5]  *Id.* ¶ 20.

### C.  The Settlement Agreement and Forced Treatment

So long as a class member has the capacity to make his own health care decisions,[6] he may, except in limited circumstances,[7] refuse any service or treatment offered by the State.  PODSMF ¶ 22.  The only exception applicable here is involuntary hospitalization pursuant to 34-B M.R.S.A. § 3863 *et seq.*[8]  DSMF ¶ 23; *State Defendants'*

---

[5] The Settlement Agreement provides:

> Not all class members . . . will require or want the active assistance of a community support worker.  [The state of Maine] shall not require that class members receive the services of a community support worker, in order to gain access to other services and resources described in this Agreement.  [The state of Maine] shall permit class members to avail themselves of community services and resources independently, with the help of their friends and family, or with various levels of intensity of assistance of a community support worker.  Class members shall be encouraged to use the level of supportive assistance appropriate to their circumstances at any particular time.

DSMF, exh. A ¶ 73; PODSMF ¶ 20.

[6] According to regulations governing the Maine Department of Health and Human Services, recipients of mental health services in outpatient settings "are legally presumed to possess capacity to give informed consent to treatment and/or services unless the recipient has been judged by a court of competent jurisdiction to lack capacity generally or to lack capacity to give informed consent to a particular treatment and/or service."   14-193   CMR   ch.   1,   pt.   C,   §   IV(D)(1),   *available at* http://www.maine.gov/sos/cec/rules/14/chaps14.htm.

[7] Under the terms of the Settlement Agreement, there are five circumstances in which services may be imposed against a class member's wishes:  (1) involuntary hospitalization pursuant to 34-B M.R.S.A. § 3863 *et seq.*; (2) forensic services pursuant to 15 M.R.S.A. § 101-B to determine a criminal defendant's competency to stand trial, criminal responsibility, abnormal condition of mind or any other issue involving the mental or emotional condition of the defendant; (3) as permitted under law in the case of a person under guardianship; (4) in a residential or hospital setting in a psychiatric emergency; and, (5) in a residential or hospital setting for individuals who lack capacity to consent to services.  DSMF, exh. A ¶¶ 32(h)(i)-(v).

[8] The parties dispute which exceptions to the forced treatment prohibition apply to Mr. Buchanan.  Plaintiff argues the exceptions in ¶¶ 32(h)(iii)-(v) of the Settlement Agreement apply; Defendants contend only the involuntary hospitalization exception in ¶ 32(h)(i) applies.  *See* PODSMF ¶ 23; PSMF ¶ 109; DSMF ¶ 23; *State Defendants' Reply to Plaintiff's Statement of Additional Material Facts* (DRPSMF) ¶ 109.

The first exception to the Settlement Agreement's ban on forced treatment, involuntary hospitalization under 34-B M.R.S.A. § 3863 *et seq.*, is potentially applicable.  Section 3863 provides that any "health officer, law enforcement officer or other person may make a written application to admit a person to a mental hospital," stating his "belief that the person is mentally ill and, because of his illness,

*Reply to Plaintiff's Statement of Additional Material Facts* (DRPSMF) ¶ 109.  Pursuant to Section 3863(1), "[a]ny health officer, law enforcement officer or other person may make a written application to admit a person to a mental hospital . . . stating:  A.  His belief that the person is mentally ill and, because of his illness, poses a likelihood of serious harm; and, B.  The grounds for this belief."  "Likelihood of serious harm" has the following meaning:

> A.  A substantial risk of physical harm to the person himself as manifested by evidence of recent threats of, or attempts at, suicide or serious bodily harm to himself . . .;

> B.  A substantial risk of physical harm to other persons as manifested by recent evidence of homicidal or other violent behavior or recent evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them . . .; or,

> C.  A reasonable certainty that severe physical or mental impairment or injury will result to the person alleged to be mentally ill as manifested by recent evidence of his actions or behavior which demonstrate his inability to avoid or protect himself from such impairment or injury . . . .

34-B M.R.S.A. § 3801(4).

### D.  Michael Buchanan and the Intensive Case Management Program

---

poses a likelihood of serious harm" and "the grounds for his belief." *See* 34-B M.R.S.A. § 3863(1).  Mr. Buchanan's Intensive Case Worker (ICM), Joel Gilbert, could have petitioned for Mr. Buchanan's involuntary commitment if he believed Mr. Buchanan posed a threat.

The third, fourth, and fifth exceptions do not apply.  The third exception applies only "in the case of a person under guardianship." *See* DSMF, exh. A ¶ 32(h)(iii).  The record reveals that on October 27, 1999, Mr. Gilbert contacted the State's Adult Protective Services (APS) bureau and requested it conduct a study to determine whether a guardian should be appointed for Mr. Buchanan.  DSMF ¶ 51; PODSMF ¶ 51.  Elaine Isakson was the APS employee assigned to investigate.  DSMF ¶ 52.  Ms. Isakson, after performing an extended assessment which ended on January 26, 2001, decided not to file a petition to seek guardianship.  DSMF ¶ 53; PODSMF ¶ 53.  Ms. Isakson spoke with Mr. Buchanan's family about private guardianships and provided them with information to petition for guardianship.  DSMF ¶ 54.  Mr. Buchanan's family, however, decided not to file a petition.  *Id.* ¶ 55.  The fourth and fifth exceptions apply only to persons "in a residential or hospital setting" in accordance with the "Rights of Recipients of Mental Health Services." *See* DSMF, exh. A ¶¶ 32(h)(iv) & (v).  The "Rights of Recipients of Mental Health Services" is the title of 14-193 CMR ch. 1, *available at* http://www.maine.gov/sos/cec/rules/14/chaps14.htm.  In this context, "residential setting" refers to a "residential facility providing mental health treatment to recipients." *Id.* pt. B, § I.  Mr. Buchanan did not live in a "residential setting"; he resided in an "outpatient setting." *See id.* pt. C.

During Mr. Buchanan's 1999 stay at AMHI, he was referred to the Maine Department of Health and Human Services' (DHHS) Intensive Case Management program. DSMF ¶ 26. The primary purpose of the Intensive Case Management program is to help persons with mental illnesses live in the community by assisting them in obtaining services and entitlements, such as housing, Medicaid and disability benefits; access to mental health treatment and medical care; fuel assistance; and, food stamps. *Id.* ¶ 27.

In the fall of 1999 while Mr. Buchanan was still a patient at AMHI, DHHS assigned Joel Gilbert, a DHHS employee, to be his intensive case manager (ICM).[9] *Id.* ¶ 28. As an ICM, Mr. Gilbert was charged with case management for a targeted group of high risk mental health clients living in a community. PODSMF ¶ 29. He provided immediate and ongoing comprehensive case management, follow up, and responsive interventions to a small group of the most problematic or high risk mental health clients to support their integration into the local community. *Id.* An ICM is obligated to assess the client's mental condition and determine whether an involuntary hospitalization evaluation by a qualified professional is warranted. PSMF ¶¶ 8-9. Such an evaluation is warranted only when the ICM believes the client poses a substantial risk of harm to himself or others, or when the client is incapable of protecting himself from harm. DRPSMF ¶¶ 8-9. If an ICM believes involuntary hospitalization is appropriate, but the client refuses to see a professional qualified to make the commitment determination, the ICM can do nothing more than alert the police. *Id.* The police may take the client into

---

[9] Mr. Gilbert holds no post-secondary degrees or professional licenses, but is a high school graduate and a Certified Mental Health Rehabilitation Technician/Community. DSMF ¶¶ 34-35. Mr. Gilbert's supervisor was Julianne Edmonson. *Id.* ¶ 30.

protective custody if they determine independently that the client poses a risk of harm to himself or others.  *Id.*

### E.  Joel Gilbert's Relationship with Michael Buchanan

Mr. Gilbert first met Mr. Buchanan at AMHI on October 7, 1999.  DSMF ¶ 36. During this visit, Mr. Buchanan told Mr. Gilbert he did not want any transportation assistance[10] and refused to go to the mental health center, but agreed to allow Mr. Gilbert "to stop by on occasion to see how he is doing, although he indicated he didn't need it." DSMF, exh. C at 1; PODSMF ¶ 37.  He also said he did not want to participate in the development of an ISP.  DSMF ¶ 37.

Mr. Buchanan was discharged from AMHI on October 19, 1999 and briefly sent to Lincoln County Jail; on October 25, 1999, he was bailed by his brother and returned home.  PSMF ¶ 28.  In preparation for his visit with Mr. Buchanan, Mr. Gilbert spoke by telephone with James Buchanan, Michael Buchanan's brother.  PSMF ¶ 30.  James Buchanan informed Mr. Gilbert that his brother was dangerous, but he had checked his home and found no weapons.  *Id.*  He did not think Michael would kill anyone, however. *Id.*

Mr. Gilbert contacted Maine's Adult Protective Services (APS) on October 27, 1999 and requested that it conduct a study to determine whether Mr. Buchanan should have a guardian.  DSMF ¶ 51; PODSMF ¶ 51.  APS assigned Elaine Isakson to investigate and, after performing an extensive assessment, she decided not to seek state guardianship of Mr. Buchanan.  DSMF ¶¶ 52-53.  Ms. Isakson, however, did speak with Mr. Buchanan's family and provided them with all the information necessary for them to

---

[10] Mr. Buchanan indicated that his neighbor would transport him to and from the grocery store as needed. DSMF, exh. C at 1.

petition for guardianship. *Id.* ¶ 54.  Mr. Buchanan's family never filed a petition for guardianship of Michael.  *Id.* ¶ 55.

Mr. Gilbert first visited Mr. Buchanan at home on October 28, 1999.  *Id.* ¶ 41. Mr. Buchanan's living conditions were horrid.  *Id.* ¶ 42.  He had no running water and his only source of heat was a woodstove.  *Id.*  He had no indoor toilet, instead he used an outhouse in his front yard.  *Id.*  In place of a bed, Mr. Buchanan slept on a sofa without cushions.  *Id.*  His only source of drinking water was a nearby stream.  *Id.*  Mr. Gilbert ended up taking Mr. Buchanan to an appointment at the Shoreline Mental Health Center. PSMF ¶ 31.  Mr. Buchanan acknowledged he needed help attending his doctor's appointments and getting to court for a hearing on his pending criminal charge.[11]  DSMF ¶ 41; PODSMF ¶ 41; *Joel Gilbert Aff.* at 33; DSMF, exh. C at 2.  He denied needing any other help.  DSMF ¶ 41.  Before Mr. Gilbert's involvement, Mr. Buchanan's brothers and sisters had done very little to improve his house.  *Id.* ¶ 56.  After Mr. Gilbert contacted family members and after Mr. Buchanan's neighbor, Teri Johnston became involved, the family began to make substantial improvements to the house.  *Id.* ¶ 57; PODSMF ¶ 57.

On November 22, 1999, Mr. Buchanan was sentenced for threatening the store clerk.  DSMF ¶ 40.  He was sentenced to serve fourteen days in jail, all suspended, and

---

[11] In paragraph 41, Defendants stated:  "Mr. Gilbert next visited Michael at home on October 28, 1999. Michael again denied needing any help other than rides to his doctor's appointments, and he would not participate in the ISP process."  DSMF ¶ 41.  Mr. Buchanan denied this paragraph, stating that "Michael Buchanan told Marilyn Johnston at Shoreline Mental Health that he needed help to get to doctor visits and to go to Court in November.  He was not asked to participate in the ISP process or given an explanation of that process."  PODSMF ¶ 41.  The parties refer to Exhibit C, which is a copy of Mr. Gilbert's notes.  The notes confirm that Mr. Buchanan asked for help getting to his physician and court appointments.  They also confirm that he "denies needing any other help."  There is no mention of the ISP process, except at the beginning of the note, which states "no isp."  In reciting these facts, this Court accepts Plaintiff's qualifications to Defendants' paragraph 41 and its denial of the reference to the ISP process.  It overrules Plaintiff's denial of Mr. Buchanan's statement that he did not need any other help, since the statement appears in Mr. Gilbert's contemporaneous notes and the Plaintiff posited no basis for his denial of that portion of paragraph 41.

one year of probation.  *Id.*  As a condition of probation, he was required to regularly see a psychiatrist and to take prescribed medications as directed by his psychiatrist.  *Id.*

During November 1999, Mr. Gilbert visited Mr. Buchanan on five occasions.[12] *Id.* ¶ 43.  During these visits, Mr. Buchanan was somewhat delusional.[13]  Mr. Gilbert also realized that Mr. Buchanan was not taking his medications in the prescribed amounts. PSMF ¶¶ 32, 34.  Mr. Gilbert did not attempt to engage Mr. Buchanan in developing and implementing an ISP during this time.[14]  Without Mr. Buchanan's participation, however, Mr. Gilbert developed an "outreach plan" on December 2, 1999. DSMF ¶ 46.  Pursuant to the outreach plan, Mr. Gilbert decided on his own that he would make weekly visits to Mr. Buchanan's residence to check on his living conditions, offer him rides to town so that he could run errands, take him to doctor's appointments, and encourage him to take his medications.  *Id.*  Mr. Gilbert kept Mr. Buchanan on the outreach plan and continued making periodic visits until December 31, 2001.  *Id.* ¶ 50; PODSMF ¶ 50.  Mr. Gilbert

---

[12] He visited him at home on November 5, November 12, November 17, November 22, and November 30. DSMF ¶ 43.  Mr. Buchanan has denied paragraph 43 in Defendants' Statement of Material Facts, but it appears that the denial is based on its assertions about the ISP, not on the dates of the actual visits, which are a matter of contemporaneous record.  *See* DSMF, exh. C at 3-5.  In fact, the Plaintiff quotes these records at length in his denial of paragraph 44.  DSMF ¶ 44; PODSMF ¶ 44.

[13] For example, on November 5, 1999, Mr. Buchanan stated, "I own the pipeline, I pay for it with all my money I stashed in German accounts, you know, tax money and my little friend is living with me, he is only two feet tall, I bought him a house."  PSMF ¶ 32.

[14] The parties dispute whether Mr. Gilbert attempted to develop an ISP with Mr. Buchanan from October to early December.  Mr. Gilbert states that he spoke to Mr. Buchanan on each visit about developing an ISP, but he refused as was his right.  *See* DSMF ¶ 43.  The case management notes during this interval do not document Mr. Gilbert's assertion.  *See* DSMF, exh. C at 3-5.  The Plaintiff argues that Mr. Gilbert "neither initiated nor developed an ISP.  He had not assessed Michael's needs or established any goals with respect to them."  *Pl.'s Mem. In Opp. to State Def.'s Mot. for Summ. Judg.* (PODMSJ) at 5.  Under the standards for ruling on the pending motion, this Court assumes the Plaintiff is correct that Mr. Gilbert failed to engage Mr. Buchanan in the development of an ISP in November, 1999.  But, this Court concludes this accepted fact is tangential and immaterial to the merits of the pending motion.  The Plaintiff's own statement of material facts, however, confirms that Mr. Buchanan repeatedly refused to participate in the development of an ISP during his involvement with Mr. Gilbert.  *See, e.g.,* PSMF ¶ 56 ("December 12, 2000:  I met with Michael to review his annual ISP today.  See ISP summary page.  He refused to do an ISP or sign any kind of treatment plan, but did agree to let us continue to work with him."); PSMF ¶ 72 ("June 15, 2001:  I reviewed Michael's ISP today without him as he is not interested or able to engage in the ISP process at this time."); PSMF ¶ 78 ("October 1, 2001:  I met with Michael today and reviewed his ISP.  He was in an agreement that he still wanted the Dept. to continue to check in and assist him shopping, but declined a treatment plan.  'I don't want to sign any paperwork, I want it to stay the way it is.'").

did not visit Mr. Buchanan at his residence from January 1, 2002 to February 25, 2002, the date Mr. Buchanan died; he did, however, inspect Mr. Buchanan's driveway for footprints and discuss Mr. Buchanan's circumstances with his neighbor, Ms. Johnston, in January 2002. *See* DSMF, exh. C at 32.

When Mr. Gilbert arranged to take Mr. Buchanan to various appointments and grocery shopping, Mr. Buchanan would often wait at the end of his lengthy driveway. DSMF ¶ 86. Although Mr. Buchanan knew when Mr. Gilbert was scheduled to pick him up, he would often wait outside for long periods in anticipation of his arrival. *Id.* ¶ 87. Mr. Gilbert realized the reason was Mr. Buchanan did not own a watch. *Id.* In December 1999, Mr. Gilbert obtained state funds and purchased a watch for Mr. Buchanan so that he would not have to stand outside in the cold unnecessarily. *Id.* ¶ 88.

On January 20, 2000, during a trip to a doctor's appointment, Mr. Buchanan told Mr. Gilbert that his woodstove was no longer working. PODSMF ¶ 69. Mr. Gilbert accompanied Mr. Buchanan to his home and found several small holes in the stove that posed a fire hazard. DSMF, exh. C at 6. Mr. Gilbert, with his supervisor's approval, obtained state funds and purchased a new woodstove for Mr. Buchanan. DSMF ¶ 69. Mr. Gilbert called one of Mr. Buchanan's brothers and asked him to install the stove. *Id.* Pending installation, Mr. Gilbert arranged for Mr. Buchanan to stay at a motel. *Id.* ¶ 70.

On March 9, 2000, Mr. Gilbert spoke with Mr. Buchanan about his problematic hygiene. PSMF ¶ 42. Specifically, Mr. Gilbert noted Mr. Buchanan needed a shower and his clothes needed laundering. *Id.* Mr. Buchanan responded that his only means of washing was a nearby stream and he could not bathe until summer. *Id.* Mr. Gilbert

discussed with Mr. Buchanan the possibility of infection if he were to sustain a cut without having bathed and told him he "would work on it." *Id.*

When Mr. Gilbert arrived on April 14, 2000, he found Mr. Buchanan covered in feces. *Id.* ¶ 45. Mr. Buchanan, although making some attempts to clean himself, refused to heed Mr. Gilbert's advice to use soap and to wash off in the brook or find a shower. *Id.* Mr. Gilbert voiced his concern about the clean-up efforts, but Mr. Buchanan refused to respond. *Id.* After returning to his office, Mr. Gilbert called crisis intervention at Shoreline Crisis to have Mr. Buchanan evaluated. *Id.* ¶ 46. The crisis worker and Mr. Gilbert went together to Mr. Buchanan's house, arriving at around 3:15 pm. *Id.*; DSMF ¶ 80. Mr. Buchanan did well answering all questions. PSMF ¶ 46. He was oriented to time and place, knew the current and past few presidents, and his long and short-term memories were sufficient. *Id.* The crisis worker concluded no further action was warranted. DSMF ¶ 80.

In September 2000, Mr. Gilbert contacted several propane heater dealers and obtained state funds to purchase a $500 propane heater for Mr. Buchanan.[15] DSMF ¶ 71. Mr. Gilbert obtained state funds for installation of the propane tanks and arranged their installation and the initial delivery of propane. *Id.* ¶ 73. He later took Mr. Buchanan to the Whitefield town office to apply for fuel assistance and persuaded a propane dealer to deliver fuel on credit pending receipt of Mr. Buchanan's first fuel assistance check. *Id.* ¶¶ 74-75. When the fuel assistance check did not arrive on time, Mr. Gilbert made follow-up telephone calls to ensure Mr. Buchanan would receive fuel assistance. *Id.* ¶ 75. The following season, Mr. Gilbert arranged for delivery of a larger propane tank so that

---

[15] Although the propane heater retailed for more than $500, Mr. Gilbert convinced the dealer to donate the balance of the cost. DSMF ¶ 72.

fewer fill-ups would be necessary. *Id.* ¶ 76.  He obtained state funds to pay for the new tank and an initial quantity of propane. *Id.*

Mr. Gilbert took Mr. Buchanan grocery shopping on numerous occasions. *Id.* ¶ 62.  On January 21, 2000, while Mr. Buchanan was staying at a motel awaiting replacement of his woodstove, Mr. Gilbert took Mr. Buchanan to lunch at a Chinese restaurant in Augusta.  PODSMF ¶ 63.  On at least eight occasions, Mr. Gilbert took Mr. Buchanan to doctor's appointments.  DSMF ¶ 64.  In addition, Mr. Gilbert took Mr. Buchanan to be fitted for glasses and, with the approval of his supervisor, Ms. Edmonson, he obtained state funds to purchase glasses for Mr. Buchanan. *Id.* ¶ 67.

On August 3, 2000, Mr. Gilbert attended a dental appointment with Mr. Buchanan. *Id.* ¶ 68.  Although the dentist recommended extracting fourteen of Mr. Buchanan's teeth, Mr. Buchanan wanted only two teeth removed. *Id.*  Mr. Gilbert attempted to persuade Mr. Buchanan to heed the dentist's advice. *Id.*  The day after the appointment, Mr. Gilbert returned to the dentist's office and asked that he continue discussing with Mr. Buchanan the need to extract all fourteen teeth. *Id.*

Until November 2000, Mr. Gilbert regularly encouraged Mr. Buchanan to take his prescribed medications, and he attempted to determine whether Mr. Buchanan was taking the proper amount of his medications by examining the contents of the pill bottles. *Id.* ¶ 58; PODSMF ¶ 58.  Mr. Gilbert also picked up and delivered prescription drugs for Mr. Buchanan.  DSMF ¶ 65.

**F.  Michael Buchanan's Deterioration and Joel Gilbert's Response**

Mr. Buchanan's one-year probation expired in November 2000. *Id.* ¶ 40.  Mr. Buchanan warned everyone that as soon as his probation was over, he was going to go off

his medications and he did.   PSMF ¶ 14.   After Mr. Buchanan self-titrated off his medicine, Mr. Gilbert's notes reflect his incremental mental deterioration.   On February 9, 2001, Ms. Johnston called to inform Mr. Gilbert that Mr. Buchanan had made some "off the wall" comments about owning oil wells and being rich.   *Id.* ¶ 59.   On March 21, 2001, he told Mr. Gilbert that "I am an M.D., psychiatrist, medical doctor, I can make a diagnosis, you know."   *Id.* ¶ 62.   On April 21, 2001, he exhibited "a lot of delusional material mixed in with what he stated" and on April 23, 2001, Mr. Buchanan's brother-in-law called Mr. Gilbert with concerns about his being "hyper-verbal and talking foolishness."   *Id.* ¶¶ 64-65.   On May 11, 2001, he began to talk about "large snakes that live in the culverts and burrow through the sand."   *Id.* ¶ 66.   On May 18, 2001, he discussed Nazis and creatures in the woods and spoke in an angry voice.   *Id.* ¶ 67.   On May 23, 2001, accompanied by another ICM, Mr. Gilbert visited Mr. Buchanan and his notes indicate that he was talking about money from foreign banks, "giant brown boa snakes" and "giant crocs and lizards."   He described the crocodiles as having eaten the boa and then the lizards having eaten the crocodiles.   *Id.* ¶ 68.

A crisis was reached in June 2001.   On June 4, 2001, Mr. Gilbert received a telephone call from Michael's brother, warning him that he had threatened to shoot the "mental health people" if "they come on my property."   *Id.* ¶ 69.   Michael's family had searched the house for a firearm and could not find one; nevertheless, they could not guarantee one was not there.   *Id.*   Mr. Gilbert contacted the Lincoln County Sheriff's Office and they agreed to accompany him to Mr. Buchanan's home.   *Id.* ¶ 70.   Mr. Gilbert and two deputy sheriffs went to visit Mr. Buchanan.   *Id.*   When they arrived, Mr. Buchanan told them to leave.   *Id.*   He said that he did not want "anything from mental

health anymore" and in fact, returned the watch that Mr. Gilbert had procured for him in 1999. *Id.* He denied making any threats or having a gun. DSMF ¶ 85.

Things seemed to calm down and on June 11, 2001, he seemed "clearer" than on June 4, agreeing to let Mr. Gilbert take him shopping later that week. PSMF ¶ 71. From late June to December, 2001, Mr. Buchanan occasionally exhibited odd affects, such as mumbling, laughing, and appearing disheveled and Mr. Gilbert continued to check on him periodically. *Id.* at ¶¶ 72-83.

Things took a turn for the worse, however, on December 12, 2001. When Mr. Gilbert arrived at the door, Mr. Buchanan appeared "very serious looking compared to his normal self." *Id.* ¶ 83. He refused to let Mr. Gilbert enter the house, until he asked permission to enter. *Id.* On December 28, 2001, Mr. Gilbert arrived at Mr. Buchanan's residence to take him to a fuel assistance appointment. DSMF ¶ 89. Mr. Buchanan was angry and confrontational; he accused Mr. Gilbert of shutting off his propane and demanded he leave and not return. *Id.* Mr. Gilbert's case management notes describe the meeting:

> [Mr. Buchanan's] anger increased steadily as his facial expressions changed. He was waiving his arms around and got to [sic] close to this writer a couple of times, forcing me to back up. "I've got five gun permits you know, I work for the government too, and I don't want anyone else coming down here". I tried to reason with Michael and get him to slow down and explain things but he became more angry and louder when I tried to talk to him. When I got a chance, in a steady low voice, I tried to reassure Michael I was not the enemy and that I didn't touch his gas line. "I don't trust you Joel Gilbert!" . . . I explained to him that I couldn't take him to his appointment today, that he was too angry and that I felt unsafe with him in my vehicle. He waived his arms some more and made more profane statements towards me, then went into his house stating "Don't come back here later, I don't want anymore help, and don't bring those sheriffs here anymore either."

14

PODSMF ¶ 89.  Despite Mr. Buchanan's outburst, Mr. Gilbert was able to determine that Mr. Buchanan had heat and was well nourished.  DSMF ¶ 90.  He left Mr. Buchanan's residence, went to the fuel assistance appointment, and completed as much of the application as possible.  *Id.*

Later that day, Mr. Gilbert called the Coastal Crisis team and the Lincoln County Sheriff's Department to provide them with some information regarding Mr. Buchanan in the event they received telephone calls about him.  *Id.* ¶ 91.  As a result of his December 28, 2001 interaction with Mr. Buchanan, Mr. Gilbert understood that Mr. Buchanan did not want him to visit anymore, and Mr. Gilbert determined that he would coordinate with another ICM to try to visit Mr. Buchanan the following week.  *Id.* ¶ 93.

On December 31, 2001, Mr. Gilbert and another ICM went to Mr. Buchanan's residence.  *Id.* ¶ 94.  Mr. Buchanan was polite and thanked Mr. Gilbert for the visit.  *Id.* Mr. Gilbert intended to visit Mr. Buchanan again on January 18, 2002, but he could not find a co-worker to accompany him.  *Id.* ¶ 95.  Instead of proceeding to Mr. Buchanan's home alone, Mr. Gilbert drove to Mr. Buchanan's driveway to determine whether he was able to get in and out of his home.  *Id.*  Mr. Gilbert noticed footprints in the fresh snow and concluded he had recently been in and out.  *Id.*

On January 22, 2002, Mr. Gilbert was again unable to find a co-worker to accompany him to Mr. Buchanan's residence.  *Id.* ¶ 96.  Instead of venturing to Mr. Buchanan's home by himself, Mr. Gilbert called Mr. Buchanan's neighbor, Ms. Johnston. *Id.*  She had visited Mr. Buchanan that morning and had taken him grocery shopping a few days earlier.  *Id.*  Although she reported that Mr. Buchanan was acting "a little

funny,"[16] Ms. Johnston said he appeared to be keeping warm with wood heat.  PSMF ¶ 87.

On February 5, 2002, Mr. Gilbert called Mr. Buchanan's brother, Daniel Buchanan.  DSMF ¶ 97.  Daniel told Mr. Gilbert of the family's renewed sense of responsibility to get guardianship of his brother and their desire to restart his medications.  PODSMF ¶ 97.  Mr. Gilbert related to Daniel his difficulty meeting with Mr. Buchanan since their December 28, 2001 meeting.  *Id.*  Mr. Gilbert told Daniel that he could not see Mr. Buchanan against his will, but that he was doing what he could to keep tabs on Mr. Buchanan through Ms. Johnston.  DSMF ¶ 97.  Daniel did not express any reservations about this approach.  *Id.*  Mr. Gilbert also called Ms. Johnston on February 5, 2002.  *Id.* ¶ 98.  Ms. Johnston reported that Mr. Buchanan "talks crazy from time to time," and that she had taken him grocery shopping that week.  *Id.*; PODSMF ¶ 98.  Ms. Johnston told Mr. Gilbert that Mr. Buchanan was fine in purchasing what he wanted at the store.  DSMF ¶ 98.

### G.  Michael Buchanan's Death

On February 25, 2002, Ms. Johnston called Mr. Gilbert to report that Mr. Buchanan had "growled and glared" at her that morning, and later her husband had seen a man who looked like Mr. Buchanan lighting a fire in their woodpile.  *Id.* ¶ 99.  Mr. Gilbert told Ms. Johnston that the fire was a criminal matter and to report the matter to the Lincoln County Sheriff's Office.  *Id.* ¶ 100.  Mr. Gilbert told Ms. Johnston that if Mr. Buchanan was responsible for the woodpile incident, "he may be sick enough to do something even worse."  PODSMF ¶ 100.  Mr. Gilbert also informed Ms. Johnston that

---

[16] According to Ms. Johnston, Mr. Buchanan was attempting to send a check to a collection agency that did not exist.  PSMF ¶ 87.

he had no authority to take Mr. Buchanan into protective custody, but that "if he is out of control, [the police would] take him into protective custody and possibly get him to a hospital for help." *Id.* ¶ 101.

Ms. Johnston called the Sheriff's Office. DSMF ¶ 107. Two deputies went to Mr. Buchanan's home, unaccompanied by Mr. Gilbert. *Id.* ¶ 108. During a confrontation on a stairwell inside Mr. Buchanan's house, Mr. Buchanan produced a knife and stabbed one of the deputies. *Id.* ¶ 109. In response, the other deputy shot and killed him. *Id.*

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). Summary judgment may enter when a plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Once the movant avers an absence of evidence to support the nonmoving party's case, the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (quoting *Celotex*, 477 U.S. at 325). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). For an issue to be "genuine," the evidence relevant to the issue, viewed in the light most flattering to the nonmoving party, must be "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side."

*Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Rather, "[t]he evidence illustrating the factual controversy . . . must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st. Cir. 1989).

## III.  DISCUSSION

### A.  Count II:  42 U.S.C. § 1983 Equal Protection Claim

In Count II of the Third Amended Complaint, Plaintiff asserts a 42 U.S.C. § 1983 claim against Joel Gilbert.[17]  Section 1983 states, in part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983.  Plaintiff alleges that Mr. Gilbert, acting under color of state law, violated Mr. Buchanan's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  *See Third Amended Complaint* ¶¶ 58-67.

Plaintiff does not assert a "classic" equal protection claim wherein one class of persons is allegedly treated differently than another class.  Rather, as Magistrate Judge Kravchuk recognized in her *Order on Motion to Amend and Recommended Decision on Motion to Dismiss by State Defendants* (Docket # 43), Plaintiff asserts a so-called "class

---

[17] Plaintiff consents to summary judgment of his Section 1983 claim in favor of Ms. Edmonson; this discussion focuses solely on Mr. Gilbert.  *See* PODMSJ at 4.

of one" equal protection claim. A "class of one" equal protection claim exists "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). While the United States Supreme Court has recognized the propriety of "class of one" equal protection claims,[18] the viability of such a claim depends upon a showing that the plaintiff was intentionally treated differently than others *similarly situated*. "The determination as to whether individuals are 'similarly situated' for equal protection purposes is an amorphous one." *Tapalian v. Tusino*, 377 F.3d 1, 6 (1st Cir. 2004). Under First Circuit law:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

*Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989) (citation omitted).

Once a "class of one" plaintiff has shown he was intentionally treated differently than others similarly situated, he must then prove no rational basis exists for the disparate treatment. *Olech*, 528 U.S. at 564. The First Circuit has opined that, in the context of a "class of one" equal protection claim, the test for determining whether a rational basis for defendants' conduct exists is an "exceptionally deferential one." *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 104 (1st Cir. 2002). A "class of one" equal protection claim will survive a motion for summary judgment where the plaintiff adduces sufficient evidence from which a reasonable jury could conclude that, "compared with others

---

[18] *See, e.g., Olech*, 528 U.S. at 564; *Allegheny Pittsburgh Coal Co. v. Comm'r of Webster City*, 488 U.S. 336, 343 (1989).

similarly situated, [plaintiff] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or* malicious or bad faith intent to injure [the plaintiff].'" *Tapalian*, 377 F.3d at 5 (emphasis in original) (quoting *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortgage Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001)).

Plaintiff's claim rests upon the latter prong, *i.e.*, an allegation of malice or bad faith.  *See Third Amended Complaint* ¶¶ 60-66 (claiming that Mr. Gilbert's allegedly illegal conduct was motivated by "disdain," "ill will," and "bias" toward Mr. Buchanan). "Normally, such a plaintiff must establish more than that the government official's actions were simply arbitrary or erroneous; instead, the plaintiff must establish the defendant's actions constituted a 'gross abuse of power.'"  *Tapalian*, 377 F.3d at 5-6 (citing *Baker v. Coxe*, 230 F.3d 470, 474 (1st Cir. 2000)); *see Rubinovitz v. Rogato*, 60 F.3d 906, 912 (1st Cir. 1995) (noting that "gross abuse of power" may obtain where official harbors personal hostility toward plaintiff, and undertakes a "malicious orchestrated campaign causing substantial harm"); *see also Olech*, 528 U.S. at 566 (Breyer, J., concurring) (noting that some otherwise "ordinary violations of city or state law" may become actionable under the equal protection clause provided the plaintiff proves "extra factor[s]," such as "vindictive action," "illegitimate animus" or "ill will"); *Esmail v. Macrane*, 53 F.3d 176, 179-80 (7th Cir. 1995) (finding viable equal protection claim based upon (i) mayor's "orchestrated campaign of official harassment directed against [plaintiff] out of sheer malice" and (ii) "spiteful effort to 'get' [plaintiff] for reasons wholly unrelated to any legitimate state objective").

The First Circuit has noted that "bad-faith or malicious-intent-to-injure cases are infrequent," and "the malice/bad faith standard should be scrupulously met." *Rubinovitz*, 60 F.3d at 911 (citations and quotations omitted).  Where the evidence is circumstantial, the inference of ill-will or improper motive "'must flow rationally from the underlying facts; that is, a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability.'"  *Id.* (quoting *Nat'l Amusements, Inc.*, 43 F.3d at 743).  If this threshold is not met, summary judgment in favor of the defendant is appropriate.

In response to Plaintiff's § 1983 equal protection claim, the State Defendants argue:  (1) there is no evidence suggesting that Mr. Gilbert treated Mr. Buchanan differently than any other client; (2) even if Plaintiffs could produce evidence that Mr. Buchanan was treated differently than others similarly situated, there is an absence of evidence showing the differential treatment was based on animus or lacked a rational basis; and, (3) even if Plaintiffs have produced evidence sufficient to establish a "class of one" equal protection claim, Mr. Gilbert is shielded from liability under the doctrine of qualified immunity.

This Court agrees with the State Defendants' first contention.  Plaintiff has failed to establish the first element of a "class of one" equal protection claim, *i.e.*, that Mr. Buchanan was treated differently than Mr. Gilbert's other clients or AMHI class members enrolled in DHHS' Intensive Case Management program generally.  Plaintiff has not pointed to, and this Court has not discovered, any evidence showing that Mr. Buchanan was treated differently than others similarly situated.  Indeed, in Plaintiff's Memorandum in Opposition to State Defendants' Motion for Summary Judgment

(PODMSJ), Plaintiff did not even respond to the State Defendants' argument regarding the lack of disparate treatment evidence.[19]  Even construing the evidence in the light most favorable to Plaintiff, this Court cannot allow the "class of one" equal protection claim to remain without some evidence tending to show Mr. Buchanan was treated differently than others similarly situated.  *See McDonald v. Village of Winnetka*, 371 F.3d 992, 1009 (7th Cir. 2004) (affirming district court's grant of summary judgment where plaintiff failed to identify similarly situated person who had been treated differently); *Campagna v. Mass. Dep't of Envtl. Protection*, 334 F.3d 150, 156 (1st Cir. 2003) (affirming dismissal of equal protection claim where persons alleged to have been treated differently were not similarly situated); *Rubinovitz*, 60 F.3d at 910 ("Plaintiffs claiming an equal protection violation *must* first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression.") (emphasis supplied) (citations and quotations omitted).

## B.  Count VII:  42 U.S.C. § 12132 Claim

In its March 10, 2005 Motion for Reconsideration, the state of Maine, relying on Eleventh Amendment immunity, asked this Court to reconsider its earlier decision that Plaintiff had stated a viable reasonable accommodation claim under Title II of the Americans with Disabilities Act (ADA).  (Docket # 66).  This Court left the courthouse

---

[19] The failure even to respond to the State Defendants' argument could provide a separate basis for granting the motion.  This is not a case where the Plaintiff, after filing a general objection, elected to concentrate on what were more central issues.  *Compare United States v. Daigle*, CR-05-29-B-W, 2005 WL 2371963 (D. Me. Sep. 27, 2005).  Here, the question of whether Mr. Buchanan was treated differently than others similarly situated was highlighted in the State's motion and is the recognized  first hurdle under Supreme Court and First Circuit authority.  *See State Defs.' Mot. for Summ. Judg.* (DMSJ) at 10-15.  In response, the Plaintiff avoided this issue and instead jumped to the question of whether Mr. Gilbert exhibited animus against Mr. Buchanan, entirely ignoring whether he treated him differently than others similarly situated. *See* PODMSJ at 3-4.

door open just a crack.  Although agreeing that *Tennessee v. Lane*, 541 U.S. 509 (2004), does not extend abrogation of Eleventh Amendment immunity to the non-fundamental, though important, rights protected by Title II, this Court denied the State's Motion for Reconsideration because Maine may have waived its Eleventh Amendment immunity by entering into the AMHI Consent Decree.[20]  (Docket # 84).  Having reviewed the terms of the Consent Decree and considered the parties' arguments, this Court concludes that the State did not waive its Eleventh Amendment immunity by entering into the AMHI Consent Decree and, therefore, summary judgment in favor of the State is appropriate with respect to Count VII of the Third Amended Complaint.

It is difficult to prove that a state has voluntarily waived Eleventh Amendment immunity.  The Supreme Court has held "that a State will be deemed to have waived its immunity 'only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239-40 (1985) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)) (quotations omitted); *see also R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 46 (1st Cir. 2002) ("the test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one") (quotations omitted).  Waiver of Eleventh Amendment immunity must be "unequivocally expressed," and all ambiguities "must be construed strictly in favor of the sovereign." *United States v. Nordic Village Inc.*, 503 U.S. 30, 33-34 (1992) (quotations omitted).  It is well-settled, under Maine law, that only the Legislature may validly waive the State's

---

[20] At the time of this Court's Order denying the State's Motion for Reconsideration, the terms of the Consent Decree were not before the Court, and the parties had not briefed whether the Consent Decree provides a sufficient basis to establish a waiver of immunity.

sovereign immunity.  *See Waterville Indus., Inc. v. Fin. Auth. of Maine*, 2000 ME 138, ¶ 21, 758 A.2d 986, 992; *Drake v. Smith*, 390 A.2d 541, 543-44 (Me. 1978).

Neither the AMHI Consent Decree nor the Settlement Agreement expressly waives the State's Eleventh Amendment immunity from Title II claims.  Indeed, the lawsuit which resulted in the Consent Decree did not involve any allegations based on Title II of the ADA.[21]  Further, nothing in the Consent Decree or the Settlement Agreement suggests the State intended to waive Eleventh Amendment immunity to Title II claims.[22]  The two documents  merely reflect the State's agreement to improve the services provided to class members and to submit to  monitoring by the state court to ensure compliance.  Plaintiff agrees with this conclusion, conceding that "[t]he State is correct in its assessment of the issue of whether the Consent Decree is an effective waiver of sovereign immunity.  It is not."  PODMSJ at 13.

Instead, Plaintiff urges this Court to revisit its holding that "Title II of the ADA, as applied to public mental health services, does not validly abrogate the State's sovereign immunity and cannot be enforced against the State of Maine in a lawsuit for monetary damages."  *Buchanan v. Maine,* 377 F. Supp. 2d at 283.  Plaintiff argues that

---

[21] The fifteen count complaint alleged violation of the plaintiffs' rights to the following:
> a reasonable opportunity for physical exercise and recreational activities; adequate sanitation, ventilation, and light; protection against physical and psychological abuse; adequate professional medical care and treatment; individualized treatment and service plans; freedom from unnecessary seclusion and restraint; appropriate privacy, humane care and treatment and a humane treatment environment; provision of treatment and related services in the least restrictive appropriate setting; adequate community support services systems and programs following discharge; timely discharge when conditions justifying hospitalization no longer exist; provision of protective services to meet the needs of incapacitated adults; and, for those patients who are public wards, a public guardian who properly and faithfully exercises his duties and responsibilities.

DSMF, exh. A ¶ 6.

[22] The Consent Decree and Settlement Agreement were executed on August 2, 1990, and Title II of the ADA became effective on January 26, 1992.  *See* Pub. L. No. 101-336, § 205(a).  It is a leap too far to conclude that Maine intended to waive its Eleventh Amendment immunity to a statutory cause of action that did not then exist and was not to become effective for nearly eighteen months.

*Lane* "supports constitutional abrogation of sovereign immunity in that class of [Title II] cases involving commitment and the abuse and neglect of persons entitled to intensive mental health services in a community setting."[23]   PODMSJ at 13 (footnote omitted). Plaintiff merely reiterates the arguments this Court earlier considered and rejected. Plaintiff has not pointed to, and this Court has not discovered, any post-*Lane* case law that extends its holding to a state's provision of mental health services.  To the contrary, since *Lane*, federal courts have, with two notable exceptions,[24] overwhelmingly held that apart from situations involving access to the courts, states are immune from Title II claims.[25]

---

[23] Plaintiff cites *In re Kevin C.*, 2004 ME 76, ¶ 11, 850 A.2d at 344, for the proposition that involuntary commitment implicates a fundamental liberty interest.  *Kevin's* relevance and the issue of commitment generally are puzzling.  Count VII of the Third Amended Complaint asserts a cause of action on the ground the state failed to provide reasonable accommodation for Mr. Buchanan.  *See Third Amended Complaint* ¶¶ 97-103.  This allegation has nothing to do with Mr. Buchanan's involuntary commitment to AMHI six years ago.

[24] In addition to *Ass'n for Disabled Am., Inc. v. Florida Int'l Univ.*, 405 F.3d 954 (11th Cir. 2005), discussed in *Buchanan,* 377 F. Supp. 2d at 283, this Court has discovered one other circuit court case extending *Lane* beyond access to the courts.  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) (extending *Lane* beyond the right of access to the courts, holding that Title II of the ADA, as applied to access to public education – a non-fundamental right – constitutes a valid exercise of Congress' enforcement power under § 5 of the Fourteenth Amendment).  But, *Association* and *Constantine* still stand alone and are not sufficiently persuasive to extend *Lane* to the wide range of public mental health services the state of Maine provides.

[25] This Court incorporates and reiterates its earlier decision on this same issue.  *Buchanan,* 377 F. Supp. 2d at 281-83.  For additional cases decided on and after that decision (July 22, 2005), see *Douris v. Office of Pa. Attorney Gen.*, 150 Fed. Appx. 113, 115 (3d Cir. 2005) (per curiam) (declining to hold that the district court erred in failing to apply *Lane* to the plaintiff's Title II claim because it did "not implicate Douris' right of access to the courts."); *McCoy v. Tex. Dep't of Criminal Justice*, No. C-05-370, 2005 WL 3262554, at * 3 (S.D. Tex. Dec. 1, 2005) (slip opinion); *Press v. State Univ. of N.Y. at Stony Brook*, 388 F. Supp. 2d 127, 135 (E.D.N.Y. 2005) (refusing to extend *Lane* "to [the] non-fundamental right [of] access to post-secondary education"); *Cisneros v. Colorado*, No. 03CV02122WDMCB, 2005 WL 1719755, at * 5 (D. Colo. July 22, 2005) (slip opinion) (declining to extend *Lane* to plaintiff's Title II claim because the Supreme Court has not definitively recognized a fundamental right to government employment); *but see Roundtree v. Adams*, No. 101CV06502OWWJLO, 2005 WL 3284405, at *7 (E.D. Cal. Dec. 1, 2005) (slip opinion) (motion to dismiss) ("Our precedent clearly commands the conclusion that the State is not entitled to Eleventh Amendment immunity under Title II of the ADA) (citing *Dare v. California*, 191 F.3d 1167, 1175 (9th Cir. 1999); *Alexander v. Univ. of N.C. at Charlotte*, No. 3:04CV570, 2005 WL 1994520, at *5 (W.D.N.C. Aug. 11, 2005) (slip opinion) (finding that Eleventh Amendment immunity was not a bar to plaintiff's Title II claim for access to post-secondary education).  None of these cases addressed abrogation of Eleventh Amendment immunity in connection with a state's provision of mental health services.

In view of the Consent Decree, Settlement Agreement, and post-*Lane* precedent, this Court concludes that the State did not waive its immunity, and congressional abrogation of Eleventh Amendment immunity in cases involving non-fundamental rights under Title II of the ADA does not extend to Maine's provision of mental health services in this case.  This Court grants summary judgment in favor of the State Defendants with respect to Plaintiff's Title II claim.

### C.  Count VI:  State Law Tort Claims

In Count VI of the Third Amended Complaint, Plaintiff alleges negligence and wrongful death against Mr. Gilbert in his personal capacity under the Maine Tort Claims Act.[26]  In response, the State Defendants contend Mr. Gilbert is shielded from liability on the basis of discretionary function immunity.

Under the Maine Tort Claims Act, employees of governmental entities are absolutely immune from personal civil liability for discretionary acts performed within the scope of their employment.  14 M.R.S.A. § 8111(1)(C).  This immunity "insulates from personal liability a government employee who has been legislatively authorized to perform some discretionary function and 'has acted, or has failed to act, pursuant to that authorization.'"  *Darling v. Augusta Mental Health Inst.*, 535 A.2d 421, 425 (Me. 1987) (quoting *True v. Ladner*, 513 A.2d 257, 260 (Me. 1986)).  In response to *True*, the Maine Legislature amended § 8111(1), expanding the scope of discretionary acts beyond those expressly authorized by "statute, charter, ordinance, order, resolution, rule or resolve," to include those "reasonably encompassed by the duties of the governmental employee."

---

[26] The Third Amended Complaint alleges negligence and wrongful death against "[t]he State of Maine by and through its Department of Behavioral and Developmental Services and the actions of its officers, servants and agents, Defendants Lynn F. Duby, John Nicholas, Julianne Edmonson and Joel Gilbert." However, this discussion will focus solely on Plaintiff's tort claims against Mr. Gilbert as Plaintiff now consents to summary judgment in favor of all other parties.  *See* PODMSJ at 15.

*See* L.D. 2443, 2d Sess. 16 (113th Leg. 1988); *Grossman v. Richards*, 1999 ME 9, ¶¶ 5-12, 722 A.2d 371, 373-75.

In *Darling*, the Law Court established a four-prong test to determine whether an employee's actions are covered by the discretionary function immunity provision of the Maine Tort Claims Act:  (1) whether the act necessarily involves a basic governmental policy, program or objective; (2) whether the act is essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective; (3) whether the act requires the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental entity involved; and, (4) whether the government possesses the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act. 535 A.2d at 426; *see also Gove v. Carter*, 2001 ME 126, ¶ 14 n.6, 775 A.2d 368, 374 n.6. "The first, second, and fourth factors help determine whether the governmental employee was performing or failing to perform an official 'function or duty.'  The third factor helps determine whether that function or duty was 'discretionary' in nature, as opposed to merely 'ministerial.'" *Carroll v. City of Portland*, 1999 ME 131, ¶ 7, 736 A.2d 279, 283 (footnote and citations omitted).  Under the third factor, the challenged activity will not qualify as "discretionary" for purposes of immunity merely because it involved "evaluation, judgment, and expertise"; rather, "the activity must also [have been] based on public policy considerations."  *Id.* ¶ 7 n.5, 283 n.5 (citing *Adriance v. Town of Standish*, 687 A.2d 238, 241 (Me. 1996)); *see also McLain v. Milligan*, 847 F. Supp. 970, 977 (D. Me. 1994) ("In determining whether an officer is carrying out a discretionary function, Maine courts focus on whether he is required to use his judgment while acting

in furtherance of a departmental policy or legislatively imposed duty.") (citing *Moore v. Lewiston*, 596 A.2d 612, 616 (Me. 1991)).

The Law Court has addressed discretionary function immunity in the context of state mental health workers on at least two occasions. In *Brooks v. Augusta Mental Health Inst.*, 606 A.2d 789 (Me. 1992), Cheryl Williams, a voluntary AMHI patient, died on account of injuries received from jumping out the exit door of a moving bus while part of a group of patients on an outing to Augusta under the supervision of three AMHI employees. *Id.* at 790. Constance Brooks, Ms. Williams' mother, filed suit alleging, *inter alia*, that the three AMHI employees were negligent in supervising the decedent. *Id.* at 791. The trial court dismissed the complaint because it failed to state a cause of action under the Maine Tort Claims Act and Ms. Brooks appealed. *Id.* at 790. On appeal, the Law Court determined that "supervision of patients by State mental health employees . . . falls within the discretionary function immunity provisions of section 8111(1)(C)" because "it involves the exercise of the individual employee's professional judgment." *Id.* at 791.

In *Darling*, Frank Darling was taken from the Cumberland County jail to Maine Medical Center (MMC) for examination due to his "strange" behavior at the jail. 535 A.2d at 422. A MMC physician certified Mr. Darling for involuntary admission to AMHI. *Id.* After his transfer, Dr. Jacobsohn, an AMHI psychiatrist, examined Mr. Darling and determined he exhibited "no evidence of major mental illness" and could not be involuntarily detained by AMHI. *Id.* Assisting Dr. Jacobsohn were another psychiatrist and two mental health workers. *Id.* Mr. Darling was sent back to the Cumberland County jail, where he was eventually released on bail. *Id.* While on bail,

Mr. Darling attacked and killed his wife and, after returning to jail, committed suicide. *Id.* at 422-23. Mr. Darling's mother sued the Commissioner of the Department of Mental Health and Mental Retardation, AMHI's Superintendent, and various AMHI employees for negligently diagnosing, treating, and discharging Mr. Darling. *Id.* at 423. She also alleged that the Commissioner and Superintendent failed to adequately train their staff and establish appropriate procedures for dealing with patients like Mr. Darling. *Id.* The Law Court, guided by the four-factor test announced in the case, "ha[d] no hesitation in determining that the alleged misconduct of [the] Commissioner . . . and Superintendent . . . f[ell] within Maine's discretionary function immunity." *Id.* at 426. With respect to Dr. Jacobsohn, the Law Court opined:

> Dr. Jacobsohn's determination whether Darling was mentally ill and posed a likelihood of serious harm was the critical threshold step in the governmental decision whether Darling continued in involuntary commitment at AMHI. Exercising a professional judgment upon that initial commitment question, central to effecting the State's important responsibilities of protecting the public and treating the mentally ill, is a discretionary function and Dr. Jacobsohn is immune from suit under the Tort Claims Act for any alleged negligence in carrying it out.

*Id.* at 428. It went on to note that release decisions should not expose the evaluator to liability because persons charged with rendering release decisions would then become "unduly responsive to one consideration – the cost of liability." *Id.* at 429. Further, "the threat of liability would undermine a statewide policy favoring open door treatment rather than custodial detention of the state's mentally ill." *Id.* The Law Court also affirmed the dismissal of the claims against the other AMHI employees because they "did nothing more than assist Dr. Jacobsohn in the evaluation and diagnosis required" by Maine law. *Id.*

This Court concludes that Mr. Gilbert is just as entitled to discretionary function immunity as the AMHI employees in *Brooks* and *Darling*.  There is no dispute that Mr. Gilbert was Mr. Buchanan's ICM, and as such  was charged with assessing  his mental condition and providing necessary support services.  Like Dr. Jacobsohn, Mr. Gilbert, in carrying out his obligations, was required to exercise his professional judgment.  He was obligated to determine, among other things, Mr. Buchanan's needs, the services required to meet those needs, and whether Mr. Buchanan posed a substantial threat to himself or others such that involuntary commitment under 34-B M.R.S.A. § 3863 *et seq.* was proper.  Mr. Gilbert's decisions to act or not to act were intertwined with the important state policy considerations of protecting the public and treating the mentally ill.

Plaintiff posits that Mr. Gilbert is not entitled to immunity under § 8111(1)(C) even if he qualifies under the *Darling* test because his acts and omissions with respect to Mr. Buchanan were allegedly motivated by animus.  Section 8111(1)(C) does not contain an express exception to immunity for acts or omissions characterized by animus. Sections 8111(1)(E) and (F), on the other hand, expressly condition immunity on the absence of "bad faith."[27]  In view of this distinction, the Law Court has held that the "immunity granted in . . . [§§ 8111(1)(A)-(D)] is absolute and not qualified by the bad faith proviso in [§ 8111(1)(E)]."  *Dall v. Caron*, 628 A.2d 117, 119 (Me. 1993); *see also*

---

[27] 14 M.R.S.A. §§ 8111(1)(E) & (F) read as follows:

> 1. Immunity.  Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:
>
> . . .
>
> > E.  Any intentional act or omission within the course and scope of employment; provided that such immunity does not exist in any case in which an employee's actions are found to have been in bad faith; or
> >
> > F.  Any act by a member of the Maine National Guard within the course and scope of employment; except that immunity does not exist when an employees actions are in bad faith or in violation of military orders while the employee is performing active state service pursuant to Title 37-B.

*Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 42 (D. Me. 2005) ("A defendant needs to be immune under only one provision."); *Grossman*, 1999 ME 9, ¶ 10, 722 A.2d at 374-75; *Berard v. McKinnis*, 1997 ME 186, ¶ 11 n.7, 699 A.2d 1148, 1152 n.7.  Mr. Gilbert performed discretionary functions or duties under § 8111(1)(C) and he is "absolutely immune" from personal civil liability.[28]  This Court grants summary judgment in favor of the State Defendants.  *See* 14 M.R.S.A. § 8111(1).

### D.  Count VIII:  Punitive Damages Count

In light of the disposition of this motion, Count VIII, the claim for punitive damages as against the State Defendants, is dismissed.  *See Rutland v. Mullen,* 2002 ME 98, ¶ 17, 798 A.2d 1104, 1111; *DiPietro v. Boynton,* 628 A.2d 1019, 1025 (Me. 1993).

## IV.  CONCLUSION

This Court GRANTS the State Defendants' Motion for Summary Judgment (Docket # 108) without objection from the Plaintiff as follows:

(1)        Count I:  Plaintiff's Section 1983 claim against Defendant Julianne Edmonson;

---

[28]        The Plaintiff makes some especially cutting and hard hitting allegations against Mr. Gilbert.  In reaching its conclusion, this Court does not imply that it concurs with the allegations that Mr. Gilbert bore a personal animus against Michael Buchanan or was otherwise derelict in his duty.  The record contains abundant evidence from which a factfinder could well conclude Mr. Gilbert did not dislike Michael Buchanan, but instead through his efforts added significantly to the quality of Mr. Buchanan's life.  Mr. Gilbert was informed at the outset that Mr. Buchanan was potentially dangerous and as it turned out, Mr. Buchanan did wield a knife against law enforcement officers.  Despite the ongoing risk of personal harm, a risk that manifestly increased as time went on, Mr. Gilbert took Mr. Buchanan to medical, legal, and dental appointments, went grocery shopping with him, assisted a reconnection between Mr. Buchanan and his siblings, made certain he had heat in the winter, attempted to assure that his driveway was plowed, and performed a host of other tasks that made Mr. Buchanan's life better.  Mr. Buchanan also died despite the considerable efforts of his siblings, a kind neighbor, and others.  The core of this tragedy is Mr. Buchanan's mental illness and his decision in November 2000 to stop taking his medications – a decision that itself may reflect his illness, but Mr. Gilbert did not have the legal authority to force Mr. Buchanan to take his medicine or to take him into custody.

None of this diminishes the tragic nature of Mr. Buchanan's death, but from this Court's perspective, there is substantial evidence from which a factfinder could determine that the Plaintiff's attempt to blame Mr. Gilbert is misplaced.  As a matter of law, however, it is unnecessary to reach this point or resolve these factual issues.

(2)    Count VI:   Plaintiff's Maine Tort Claims Act claims against Defendants Lynn F. Duby, John Nicholas, and Julianne Edmonson; and,

(3)    Count VIII:   Plaintiff's Punitive Damages claim against Defendants Lynn F. Duby, John Nicholas, and Julianne Edmonson to the extent the claim is based on counts to which the Plaintiff has consented to summary judgment.

This Court GRANTS the State Defendants' Motion for Summary Judgment on all remaining counts in its entirety.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE


Dated this 16th day of February, 2006