# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| DANIEL BUCHANAN, as Personal | ) | |
| Representative of the Estate of | ) | |
| Michael Buchanan, et al., | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | Civil No. 04-26-B-W |
|  | ) | |
| STATE OF MAINE, et al. | ) | |
|  | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS LINCOLN COUNTY, WILLIAM CARTER, TODD BRACKETT, ROBERT EMERSON AND KENNETH HATCH'S MOTION FOR SUMMARY JUDGMENT

On February 25, 2002, Lincoln County Deputy Sheriff Kenneth Hatch shot and killed Michael Buchanan. This law suit tests the legal implications of his death.[1] Concluding that (1) Deputy Hatch's and Deputy Emerson's warrantless entry of Mr. Buchanan's home was reasonable under the Fourth Amendment; (2) Deputy Hatch's use of deadly force was reasonable under the Fourth Amendment; (3) Lincoln County did not violate Mr. Buchanan's Fourth Amendment rights; (4) former Lincoln County Sheriff William Carter is not subject to supervisory liability for the acts of Deputies Hatch and Emerson; and, (5) Title II of the ADA does not apply in the exigent circumstances here, this Court grants the County Defendants' Motion for Summary Judgment (Docket # 81).[2]

---

[1] This Court has issued four decisions on this case. *See Buchanan v. Maine*, 377 F. Supp. 2d 276 (D. Me. 2005); *Buchanan v. Maine*, 366 F. Supp. 2d 169 (D. Me. 2005); *Buchanan v. Maine*, No. Civ. 04-26-B-W, 2004 WL 2538387 (D. Me. Nov. 9, 2004) (Magistrate Judge Kravchuk); *Buchanan v. Maine*, No. Civ. 04-26-B-W, 2004 WL 2457796 (D. Me. Nov. 2, 2004) (Magistrate Judge Kravchuk). With this decision, this Court is issuing a sixth decision on a companion motion for summary judgment regarding the State Defendants.

[2] The so-called County Defendants are Lincoln County; William Carter in his individual capacity; Todd Brackett, in his official capacity; Robert Emerson, in his individual capacity; and, Kenneth Hatch, in his

## I. STATEMENT OF FACTS[3]

### A. The Sheriff Is Called

On February 25, 2002, at about 5:11 p.m., Teri Johnston of Jefferson, Maine called Lincoln County Communications Officer Kathy Blandon to ask the Sheriff's Department to check on her neighbor, Michael Buchanan. *Defendants' Statement of Material Facts* (Docket # 82) (DSMF) ¶ 6; *Plaintiff's Statement of Additional Material Facts* (Docket # 89) (PSMF) ¶ 1. At 5:14 p.m., after being assigned the call, Lincoln County Deputy Sheriff Kenneth Hatch discussed the situation with Ms. Johnston. PSMF ¶ 2. She explained that Mr. Buchanan had tried to light her woodpile on fire and although she did not want him arrested, she asked the Sheriff's Department to check on his well being.[4] DSMF ¶ 6; PSMF ¶¶ 1, 2.

After Deputy Hatch received the call, he instructed Deputy Robert Emerson to accompany him.[5] DSMF ¶ 7; *Plaintiffs' Opposition to Defendants' Statement of Material Facts* (Docket # 89) (PODSMF) ¶ 7. Deputy Hatch was not familiar with Mr. Buchanan or his residence, but learned from Ms. Johnston that it was located approximately a half

---

individual capacity. The Plaintiff's Third Amended Complaint states claims against the County Defendants in Counts III, IV, V, VII, and VIII.

[3] On August 29, 2005, in violation of Local Rule 56(e), the County Defendants filed a motion to strike portions of Plaintiff's opposition to their statement of material fact. (Docket # 98). After giving the benefit of the doubt to their assertion of confusion as to whether Local Rule 56(e) applies to responses to statements of material fact and in view of the fact that its contents would have been appropriate, if properly placed in the response, this Court allowed the filing. (Docket # 112). This Court DENIES Defendants' motion to strike, because it fails to generate issues which affect the merits of the pending motion for summary judgment.

[4] Ironically, despite the fact their statements of material fact refer to the contents of Ms. Johnston's conversation, Defendants object to the Plaintiff's statement of material fact paragraphs 1 and 2 on the ground that the contents of the call contain "three levels" of inadmissible hearsay. DSMF ¶ 6; *Defendants' Reply to Plaintiff's Statement of Additional Material Facts* (Docket # 99) (DRPSMF) ¶¶ 1, 2. The Defendants' objection is overruled. Ms. Johnston's statements are not admitted for their truth, but to explain the context of the deputies' subsequent actions.

[5] The Defendants assert that Deputy Hatch did not instruct Deputy Emerson to accompany him, but asked him to do so. DSMF ¶ 7. Plaintiff objected, stating that Deputy Hatch instructed him to do so. *Plaintiff's Opposition to Defendants' Statement of Material Facts* (Docket # 89) (PODSMF) ¶ 7. This Court is obligated to view the evidence in a light most favorable to the non-moving party and has adopted Plaintiff's version.

mile into the woods and the driveway was not plowed.  PSMF ¶ 3.  Deputy Hatch concluded it was better to have a back up, given the nature of the call and the location of the residence.[6]  *Id.*  They were dressed in full police uniforms.  DSMF ¶ 8.  Neither Deputy Hatch nor Deputy Emerson had any prior knowledge of  or dealings with Mr. Buchanan.  PSMF ¶ 4.

**B.  The Deputies Arrive and Mr. Buchanan Appears**

At approximately 5:59 p.m., Deputies Emerson and Hatch arrived at the entrance of Mr. Buchanan's unplowed driveway in Somerville, and Deputy Emerson radioed dispatch that he and Deputy Hatch were about to walk the quarter to half-mile trek to Mr. Buchanan's house.[7]  DSMF ¶ 9; PSMF ¶ 5.  As they approached, Deputy Emerson could see a light in the residence.  PSMF ¶ 6.  The residence was approximately 36 feet long and 24 feet wide with a daylight basement and a single story over the basement.  *Id.*  The upstairs had two windows: one on the short side of the house and the other on the long side.  *Id.* ¶ 7.  They walked to the area outside the house where the lights were on.  *Id.*

 While Deputy Emerson walked along the side of the house to determine whether there were any other doors, Deputy Hatch went to the door and knocked several times.  DSMF ¶ 10; PODSMF ¶ 10; PSMF ¶ 8.  No one came to the door.  PSMF ¶ 8.  The deputies first observed Mr. Buchanan walking to a window in his kitchen.  DSMF ¶ 11; PODSMF ¶ 11; PSMF ¶ 10.  He appeared to be screaming, but the deputies initially could not hear his voice because the window was shut.  PODSMF ¶ 11.  Mr. Buchanan

---

[6] Defendant qualified his admission of this statement by noting that he asked Deputy Emerson to accompany him, based on the suggestion of another officer.  DRPSMF ¶ 3.  This Court is obligated to view the evidence in a light most favorable to the non-moving party and has adopted Plaintiff's version.
[7] The parties dispute the length of time it took the deputies to walk down the driveway.  The Defendants estimate it took ten to fifteen minutes.  DSMF ¶ 9.  The Plaintiff objects, asserting the road was not plowed and was difficult to walk down, but offers no alternative time estimate.  PODSMF ¶ 9.  This Court is obligated to view the evidence in a light most favorable to the non-moving party and assumes it took at least ten to fifteen minutes to walk down the driveway.

proceeded to another window, which he opened.   PSMF ¶ 10.   He screamed that he worked for the Massachusetts Sheriff's Department and that "You are not throwing me in a Nazi Jewish oven." *Id.*

Deputy Emerson yelled, "Michael, are you okay? We are here to check on you." *Id.* ¶ 11.  Mr. Buchanan responded that they were not there to check on him and began screaming about being with the New York State Police and the federal government, and that he had the right to sell guns. *Id.*  Deputy Emerson replied that they were just there to check on him, but Mr. Buchanan said, "No," and they were just trying to get "Evelyn" after him. *Id.*  Deputy Emerson replied he did not know who Evelyn was. *Id.*  Mr. Buchanan told them to get off his property, to go back to the main road, and that he was going to kill them. *Id.* ¶ 12.

Mr. Buchanan reappeared, reopened the window, and started screaming nonsensical "babble." *Id.* ¶ 13.  On the assumption that Evelyn may have been his counselor, Deputy Emerson told Mr. Buchanan they would call Evelyn if he wanted them to do so. *Id.*  Mr. Buchanan replied, "Evelyn, the Hun" and "Evelyn, the Nazi" and swore at them. *Id.*  At that point, Mr. Buchanan walked away from the window and then returned. *Id.* ¶ 14.  He threw some liquid that smelled like liquor at Deputy Emerson. *Id.* Deputy Emerson stepped back to avoid the liquid and was struck by only a small amount. *Id.* ¶ 15.

Mr. Buchanan then shut the window, turned off the interior light, and left the room. *Id.* ¶ 17.  He proceeded to the other end of the house and turned lights on there. *Id*.  At this time, Deputy Hatch had radioed dispatch to advise them of the situation and the possibility that Mr. Buchanan had barricaded himself inside the residence. *Id.* ¶ 18.

He requested that dispatch contact Ms. Johnston to ascertain the name of Mr. Buchanan's counselor. *Id.* He asked dispatch to find out what the counselor advised. *Id.*

Deputy Emerson was at the entry door when he heard a loud smashing sound, which he initially thought was a gunshot, but concluded was breaking glass. DSMF ¶ 17; PODSMF ¶ 17; PSMF ¶ 17; DRPSMF ¶ 17. He yelled to Deputy Hatch, asking him if the loud noise was a shotgun blast. PODSMF ¶ 18. Deputy Hatch advised Deputy Emerson that he was unsure, but believed it was a window breaking. *Id.* Deputy Hatch requested that dispatch also call the on-call supervisor and apprise him of the situation. *Id.*

### C. Mr. Buchanan Reappears and Retreats

Shortly after the deputies heard the loud smashing sound, Deputy Emerson shined his flashlight into the basement of the house and observed Mr. Buchanan coming down the stairs into the cellar toward the exterior door. PSMF ¶¶ 19, 20. Deputy Emerson could see Mr. Buchanan's hands and noticed the knuckles on at least one hand were bloody. *Id.* ¶ 20. Deputy Emerson was standing just outside the basement door. *Id.* ¶ 19. Mr. Buchanan opened the door, began screaming to take your "fucking warrants" and about the Commonwealth of Massachusetts and the federal government. *Id.* ¶ 22. Deputy Emerson told Mr. Buchanan that he had no warrants, and Mr. Buchanan spit at Deputy Emerson, hitting him in the chest. *Id.* Mr. Buchanan turned and started back upstairs. *Id.* ¶ 23.

### D. The Deputies Enter

Realizing Mr. Buchanan had left the basement door ajar, Deputy Emerson followed him into the residence, because having seen the injury to Mr. Buchanan's hand

and having heard the breaking glass, he thought Mr. Buchanan was going to injure himself. *Id.* ¶ 27. Deputy Hatch followed shortly, and saw some blood on Mr. Buchanan's hand.[8] DSMF ¶ 25; PODSMF ¶ 25. When Mr. Buchanan was approximately half way up the basement stairs, he leaned over the stairwell railing and began throwing his arms around and screaming. PSMF ¶ 25. Deputy Emerson attempted to grab Mr. Buchanan's hand, but missed. *Id.* Mr. Buchanan screamed, spit at him, and ran up the remaining stairs. *Id.* As Mr. Buchanan turned to go up the stairs, Deputy Emerson made another attempt to grab his arm, but missed again. *Id.* ¶ 26. Deputy Emerson was about one-third of the way up the stairs, when Mr. Buchanan passed through the door into the living area and slammed it closed. *Id.* ¶ 29.

### E.  Mr. Buchanan is Shot and Killed

As Mr. Buchanan shut the door, Deputy Emerson proceeded up the stairway with Deputy Hatch behind him. *Id.* ¶¶ 29, 30. Deputy Emerson was about three-quarters of the way up the staircase, almost near the landing, and Deputy Hatch was on the third or fourth step from the bottom. *Id.* ¶¶ 30, 31. Mr. Buchanan suddenly reopened the door and stepped out on the landing, holding a knife in his right hand. DSMF ¶ 28; PODSMF ¶ 28; PSMF ¶ 31, 70. Deputy Emerson attempted, unsuccessfully, to seize the knife and Mr. Buchanan grabbed Deputy Emerson's back. PODSMF ¶ 29. Deputy Emerson screamed, "Knife*,*" and Mr. Buchanan plunged the knife into the back of Deputy Emerson's shoulder. *Id.* ¶ 25. Deputy Emerson cried out: "Kenny, he stabbed me, he's killing me, save me, help me." *Id.* Deputy Hatch drew his weapon and Mr. Buchanan

---

[8] Defendants' statement of material fact 25 states: "Hatch came to the door, and he saw blood on Buchanan's hands." DSMF ¶ 25. Plaintiff has qualified his admission of this statement by noting that in his deposition, Deputy Hatch said he saw a "trickle" or a "spot" of blood. PODSMF ¶ 25. This Court is obligated to view the evidence in a light most favorable to the non-moving party and assumes that when Deputy Hatch saw some blood on Mr. Buchanan's hand, it was a trickle or spot of blood.

looked directly at him.  *Id.* ¶ 32.  Deputy Hatch fired at Mr. Buchanan and continued to do so.  *Id.*  As he did, Mr. Buchanan continued to stab Deputy Emerson several times.  *Id.*  Deputy Hatch shot and killed Mr. Buchanan, who fell from the landing at the top of the stairs onto the dirt floor below.  *Id.*; DSMF ¶ 32.

### F.  Training

Kenneth Hatch and Robert Emerson were full-time deputies for the Lincoln County Police Department on February 25, 2002.  DSMF ¶ 4.  All deputy sheriffs employed by the Department, including Deputies Hatch and Emerson, receive training and law enforcement certification from the Maine Criminal Justice Academy.  *Id.* ¶ 42. The Lincoln County Sheriff's Department periodically provides training to its deputies, including at a minimum that which is required by the Maine Criminal Justice Academy, as well as training on Lincoln County Sheriff's Department Policy and Procedure Manual.[9]  *Id.* ¶ 44.  Deputies Hatch and Emerson were trained on the Lincoln County Sheriff's Department Policies on the Use of Force and Response to Deviant Behavior and Deputy Hatch took a course at the Criminal Justice Academy on dealing with the mentally ill.  *Id.* ¶¶ 45, 47.  Deputies Hatch and Emerson were trained on how to deal with people with mental illness and learned to stay calm and not to be aggressive when speaking to them; however, other than being told to remain calm and speak softly, neither deputy was taught skills or techniques to get a mentally ill person to calm down.  *Id.* ¶ 46; PODSMF ¶ 46.  In December 2001, Deputies Hatch and Emerson completed an Annual Review of Policy and Procedures, which covered the policies on Use of Force

---

[9] Plaintiff objects to Defendants' statement of material fact 44 on the grounds that it is immaterial, self-serving, and irrelevant.  PODSMF ¶ 44.  Defendants' reference is to an Affidavit of William Carter, the Lincoln County Sheriff at the time of the incident, and the statement is supported by the reference.  This Court overrules Plaintiff's objections.

and Response to Deviant Behavior.  DSMF ¶ 48.  The review was both oral and written and the written portion involved completing a worksheet on each policy.  *Id.*  As a supervisor and the final decisionmaker at the Lincoln County Sheriff's Department, Sheriff Carter had never known of or perceived the need for any additional training or policies in the areas of use of force or handling persons with mental illnesses, primarily because the Lincoln County Sheriff's Department had never had any problems or complaints in those areas before this lawsuit.[10]  *Id.* ¶ 49.

### G.  Psychiatric Condition

Mr. Buchanan carried a mental illness diagnosed as "bipolar disorder with psychosis versus schizoaffective disorder vs. schizophrenia, paranoid type."[11]  DSMF ¶ 5; PODSMF ¶ 5.  He was a member of a class of Augusta Mental Health Institute (AMHI) patients covered in *Bates v. Glover*.[12]  DSMF ¶ 5.  He had an individualized service plan and was assigned an intensive case manager.  *Id.*

## II.  THE LAWSUIT

### A.  The Parties

On February 25, 2004, Daniel Buchanan, acting as personal representative of the estate of his brother, Michael Buchanan, filed suit against the state of Maine and Lincoln County.  In addition to the State and County, the Third Amended Complaint asserts claims against certain other individuals (the County Defendants):  William Carter, in his

---

[10] Plaintiff objects to Defendants' statement of material fact 49 on the grounds that the contents are immaterial, irrelevant, and inadmissible under Rules 401, 402, 403, 404, 406 and as an exception to 802. This Court overrules the Plaintiff's objections.

[11] Defendants described Mr. Buchanan's diagnosis as "bipolar disorder as well as schizophrenia with paranoia."  Plaintiff objected and interposed the definition quoted above.  The Court has assumed the Plaintiff's definition is correct for purposes of this motion.

[12] Although Defendants referred to *Bates v. Glover* in their statement of material fact, there is no further discussion of its impact, if any, on the County Defendants.  Neither party asserts *Bates v. Glover* affects the merits of the pending motion.  For a more detailed explanation of *Bates v. Glover*, see *Buchanan*, 377 F. Supp. 2d at 283 and the companion decision issued today regarding the State Defendants.

individual capacity only; Todd Brackett, in his official capacity as the Lincoln County Sheriff; Robert Emerson in his individual capacity only; and, Kenneth Hatch, in his individual capacity only.

### B.  The Causes of Action Against the County Defendants

Counts III through V of the Third Amended Complaint are § 1983 claims; Count VII alleges a Title II ADA reasonable accommodation violation; and, Count VIII is a punitive damages claim.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).   Not every factual dispute is "sufficient to thwart summary judgment; the contested fact must be 'material' and the dispute over it must be 'genuine.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93 (1st Cir. 2001).  A "material" fact is one that "might affect the outcome of the suit under the applicable legal standard."  *Santoni*, 369 F.3d at 598 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   An issue is "genuine" if the evidence is such that "a reasonable jury could resolve it in favor of either party."  *Id.* (citation omitted).  In deciding whether a genuine issue of material fact exists, the Court "construes the evidence in the light most favorable to the non-moving party."  *Id.*  (citing *Flowers v. Fiore*, 359 F.3d 24, 29 (1st Cir. 2004)).

### B.  Local Rule 56

The evidence the Court may consider in deciding whether genuine issues of material fact exist for purposes of a summary judgment motion is circumscribed by the local rules of this District. *See* Local Rule 56; *Hall-Wagner v. GMRI, Inc.*, Docket No. 05-28-P-H at 2-3 (D. Me. Nov. 23, 2005) (Magistrate Judge Cohen). The moving party must first file a statement of material facts it claims are not in dispute. Local Rule 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *Id.* The nonmoving party is then required to submit a responsive "separate, short and concise" statement of facts in which it must "admit, deny, or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts." Local Rule 56(c). The nonmovant likewise must support each denial or qualification with an accurate record citation. *Id.* The moving party may then respond with a reply statement of material facts in similar format. Local Rule 56(d). Failure to comply with the Rule can result in serious consequences: "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Local Rule 56(e).

In general, Local Rule 56 contemplates the Court will discount any statement of material fact or a response containing irrelevant argument or factual assertions unsupported by appropriate record citation. *See* Local Rule 56(e); *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997) (the "evidence illustrating the factual controversy cannot be conjectural or problematic" and "effusive rhetoric and optimistic surmise" is not enough to establish a genuine issue of material fact); *Toomey v. Unum Life Ins. Co.*,

324 F. Supp. 2d 220, 222 (D. Me. 2004).  This Court has ignored statements of fact submitted by the parties that are merely speculative or unsupported by the record.

### C.  Count V:  42 U.S.C. § 1983 Claims Against Defendants Robert Emerson and Kenneth Hatch

In Count V of the Third Amended Complaint, Plaintiff asserts a 42 U.S.C. § 1983[13] claim against Deputies Emerson and Hatch.[14]  Plaintiff alleges Defendants, acting under color of state law, violated Mr. Buchanan's Fourth Amendment[15] right to be free from unreasonable searches and seizures.  *See Third Amend. Compl.* (Docket # 86) ¶¶ 83-89.  Plaintiff claims the Defendants violated Mr. Buchanan's rights by unreasonably entering his home without a warrant and unreasonably seizing Mr. Buchanan by means of excessive force.  *Id.*  While Deputies Emerson and Hatch concede they entered Mr. Buchanan's home without a search warrant and Deputy Hatch "seized" Mr. Buchanan within the meaning of the Fourth Amendment, they contend the search and the seizure did not violate the Fourth Amendment.  Alternatively, Defendants argue they are entitled to qualified immunity.

### 1.  The Fourth Amendment and the Warrantless Entry

Mr. Buchanan enjoyed Fourth Amendment protection against unreasonable searches and seizures by the government.  In no place "is the zone of privacy more

---

[13] Section 1983 states, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."  42 U.S.C. § 1983.

[14] This discussion starts with Count V, because it sets the stage for the discussions on both the earlier and later counts.

[15] The Fourth Amendment to the United States Constitution provides:
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 589 (1980); *see Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) ("It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'") (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). Indeed, the "constitutional rights allegedly violated were clearly established long before this tragic incident occurred." *Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir. 1995), *cert. denied*, 516 U.S. 1029 (1995).  Therefore, "[a] warrantless search involving an intrusion into [Mr. Buchanan's] home is presumptively unreasonable . . . ." *United States v. Beaudoin*, 362 F.3d 60, 65 (1st Cir. 2004).

The presumption, however, is not conclusive.  The touchstone of the warrantless entry analysis under the Fourth Amendment is objective reasonableness:  "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (in analyzing the reasonableness of a search or seizure, "it is imperative that the facts be judged against an objective standard"); *Davis v. Rennie*, 264 F.3d 86, 101-02 (1st Cir. 2001).  In applying the reasonableness standard, courts should pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)) (the

question is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure").

Moreover, in cases involving "potential danger, emergency conditions or other exigent circumstances," the "standard of reasonableness is comparatively generous." *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994). "Whether substantive liability or qualified immunity is at issue, the Supreme Court intends to surround the police who make . . . on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases."[16] *Id.* This precept applies with special force where the government can demonstrate "exigent circumstances" creating a "'compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant.'" *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995) (quoting *United States v. Wilson*, 36 F.3d 205, 209 (1st Cir. 1994)); *see also United States v.*

---

[16]     Although reasonableness lies at the heart of whether a constitutional violation occurred and qualified immunity applies, the analyses are distinct. The Supreme Court explained:

> In *Anderson* [*v. Creighton*, 483 U.S. 635 (1987)], a warrantless search case, we rejected the argument that there is no distinction between the reasonableness standard for warrantless searches and the qualified immunity inquiry. We acknowledged there was some "surface appeal" to the argument that, because the Fourth Amendment's guarantee was a right to be free from "unreasonable" searches and seizures, it would be inconsistent to conclude that an officer who acted unreasonably under the constitutional standard nevertheless was entitled to immunity because he "'reasonably' acted unreasonably." This superficial similarity, however, could not overcome either our history of applying qualified immunity analysis to Fourth Amendment claims against officers or the justifications for applying the doctrine in an area where officers perform their duties with considerable uncertainty as to "whether particular searches or seizures comport with the Fourth Amendment." With respect, moreover, to the argument made in *Anderson* that an exception should be made for Fourth Amendment cases, we observed, "the heavy burden this argument must sustain to be successful," since "the doctrine of qualified immunity reflects a balance that has been struck 'across the board.'" We held that qualified immunity applied in the Fourth Amendment context just as it would for any other claim of official misconduct.

*Saucier v. Katz*, 533 U.S. 194, 203 (2001) (internal citations omitted).

     Similarly, the First Circuit noted in the context of probable cause and qualified immunity determinations: "A state actor may be entitled to qualified immunity for rights-violating conduct as long as he had an objectively reasonable basis for believing that his conduct would not abridge the rights of others. This means, of course, that the reasonableness standards underlying the probable cause and qualified immunity inquiries are not coterminous." *Iacobucci v. Boulter*, 193 F.3d 14, 23 (1st Cir. 1999) (internal citations omitted).

*Almonte*, 952 F.2d 20, 22 (1st Cir. 1991), *cert. denied*, 503 U.S. 1010 (1992); *United States v. Adams*, 621 F.2d 41, 44 (1st Cir. 1980).  Although "exigency" determinations are "necessarily 'fact-based,'" *United States v. Donlin*, 982 F.2d 31, 34 (1st Cir. 1992), turning on the reasonableness of "assessments contemporaneously made by government agents in light of the developing circumstances at the scene of the search," *McCabe v. Life-Line Ambulance Serv. Inc.*, 77 F.3d 540, 545 (1st Cir. 1996), "exigent circumstances" have been found to include:[17] "a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to [the suspect himself]." *Hegarty*, 53 F.3d at 1374 (citing *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)).[18]

Deputies Hatch and Emerson argue this exigency applies here.  In particular, Defendants contend they had probable cause to believe, based on prior knowledge and their ongoing assessment of the situation at the scene, that Mr. Buchanan was mentally ill and posed an imminent risk of substantial physical harm to himself.  Thus, Defendants argue, their warrantless entry into the residence to take Mr. Buchanan into protective custody pursuant to statutory authority was reasonable and constitutional.

There is substantial evidence that Deputies Hatch and Emerson could have reasonably believed that Mr. Buchanan posed the sort of threat to himself contemplated by the exigent circumstance exception.  Defendants arrived well after sunset in the middle of a Maine winter at Mr. Buchanan's remote residence to perform a "wellness

---

[17] *Hegarty* lists three other "exigent circumstances":  (1) "hot pursuit"; (2) threatened destruction of evidence; and, (3) risk of escape.  *Hegarty,* 53 F.3d at 1374.  The County Defendants do not contend these three circumstances apply here.

[18] Closely related is the "emergency doctrine."  In *Beaudoin*, the First Circuit recognized the emergency doctrine in which police may, in some circumstances, act without a warrant to save someone's life or prevent harm.  362 F.3d at 66.  Under the emergency doctrine, government agents must have a reasonable basis, similar to probable cause, "both to believe in the existence of the emergency and to associate that emergency with the area or place to be searched."  *Id.*  The analysis must consider "the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences."  *Id.* (internal quotations and citation omitted).

check" precipitated by a phone call from Mr. Buchanan's neighbor, informing them that he had attempted to set her woodpile on fire.  Once the deputies arrived, Mr. Buchanan began yelling incoherent statements about Nazis, ovens, his license to sell firearms, and his employment with the federal government, with the Massachusetts Sheriff's Department, and with the New York State Police.  Mr. Buchanan screamed at the Deputies, ordered them off his property, and threatened to kill them.  He threw liquid at Deputy Emerson out of a window in his house and spit at him from the basement door. When he arrived at the door, he swore at them about their "warrants."[19]  Both deputies heard a loud noise which they eventually realized was breaking glass and both of them saw blood on at least one of Mr. Buchanan's hands.[20]

In this Court's view, these facts are sufficient to establish a reasonable belief that Mr. Buchanan posed an immediate threat to his own safety, overcoming the presumption of unconstitutionality associated with warrantless entries into private homes.  Moreover, the developing circumstances at the scene, the time of day, the winter conditions, and the remote location of Mr. Buchanan's residence made it more reasonable for Deputies Hatch and Emerson to enter the home immediately instead of obtaining a warrant.[21]

---

[19] Mr. Buchanan may have assumed the Deputies had a search warrant; if so, this incident may have occurred exactly as it did, even if they obtained one.

[20] Part of Mr. Buchanan's argument is that those facts admitted for purposes of the pending motion are "filled with inconsistencies . . .[,] anomalies[,] and directly contradict[] the physical evidence," *Plaintiff's Memorandum In Opposition to Defendants' Motion for Summary Judgment* (Docket # 88) (PODMSJ) at 10, and as such, they create genuine issues of material fact appropriate for jury resolution.  For example, he states that the cut on Mr. Buchanan's hand turned out to be "superficial and trivial."  *Id.* at 15.  He also disputes Deputy Hatch's description of where he was when he shot Mr. Buchanan.  *Id.* at 7.  This Court has carefully reviewed Mr. Buchanan's memorandum and has determined that the admitted facts do not generate genuine issues of material fact that prevent this Court from granting summary judgment.

[21] We now have the considerable luxury of knowing that Mr. Buchanan was killed and it is easy to pronounce how his death could have been avoided.  Of course, we cannot know what would have happened, if a different course had been taken: whether he would have seriously injured himself, attempted to hurt others, or surrendered peacefully.  What makes this case all the more tragic is that in their efforts to protect Mr. Buchanan, the deputies ended up killing him.

Plaintiff contends, not unpersuasively, that despite this evidence, whether a defendant has acted "reasonably" is quintessentially a jury issue and he should have his day in court before a jury to resolve the factual questions that comprise the reasonableness calculus.  Fortunately, the First Circuit in *Roy* illuminated the analytic path.   Addressing a similar situation, *Roy* acknowledged that "[j]udgments about reasonableness are usually made by juries in arguable cases." *Roy*, 42 F.3d at 694.  If this were a common law negligence case, this Court, as in *Roy*, would have little difficulty concluding that the Plaintiff generated a factual question on reasonableness requiring jury resolution.   One might well think a "hard look" is warranted where law enforcement officers chase a distraught, deranged, and potentially violent man up the stairs of his own house only to provoke a distraught, deranged, and violent reaction. *Id. Roy* observed that "most drunks are disarmed without anyone shooting them" and the same can be said of those afflicted with serious mental illness. *Id.*

But, as *Roy* explained, the Supreme Court's "comparatively generous" standard of reasonableness in exigent circumstances means that a jury "does not automatically get to second-guess these life and death decisions, even though the plaintiff has . . . a plausible claim that the situation could better have been handled differently." *Id.* at 695.  Even though a jury could rationally determine that the deputies "could have done a better job," the question as posed in *Roy* is whether their conduct was "so deficient that no reasonable officer could have made the same choice as [the defendants] - in circumstances that were assuredly 'tense, uncertain, and rapidly evolving . . . .'" *Id.* (quoting *Graham*, 490 U.S. at 397).  Applying this onerous standard, this Court cannot conclude that the conduct of Deputies Emerson and Hatch was so deficient that it was unconstitutional.

Mr. Buchanan nevertheless urges this Court to determine there was no exigency. He presses this Court to consider the First Circuit's admonition against entry into a suspect's home to make a warrantless arrest: "The ultimate test is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *Adams*, 621 F.2d at 44; *see Fletcher v. Town of Clinton*, 196 F.3d 41, 49 (1st Cir. 1999). Mr. Buchanan disputes the significance of the events leading to the stairway confrontation and he implies, though does not directly state, that the deputies should have sought alternatives.[22] *See* PODMSJ at 5-12.

But, in *Hegarty*, the First Circuit made it clear that "unless the challenged police conduct was clearly incompetent or undertaken in plain violation of established law," the courts are not to "determine which of these strategies represented the *more* prudent course or posed the *least* serious risk to the suspect, the officers or others in the vicinity." 53 F.3d at 1377 (emphasis in original) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)) ("Officers . . . need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.").

Finally, Mr. Buchanan argues the Deputies improperly created their own exigency for their entry into Mr. Buchanan's residence and the use of deadly force. *See Hegarty*, 53 F.3d at 1375. Citing *United States v. Curzi*, 867 F.2d 36, 43 n.6 (1st Cir. 1989), he correctly observes that the police cannot manipulate events to create an

---

[22] Mr. Buchanan criticizes the Deputies for failing to follow police protocol. He says that Deputy Emerson violated "the precepts of his training and Department policy by continuing to follow Buchanan when he knew he could not catch him before he entered the upstairs living area." PODMSJ at 10. He claims that Deputy Hatch was "attempting to follow Department protocol," but Deputy Emerson's "breach of the entrance [to] Michael Buchanan's home caused Hatch to abandon protocol and follow Emerson into the dwelling." *Id.* at 17. Plaintiff's argument contains no record citations and this Court is left to guess if and where the record supports these contentions. Further, unlike *Hegarty*, Plaintiff presented no expert testimony to support factually his legal contentions. *Compare Hegarty*, 53 F.3d at 1377-78.

"exigency" justifying a warrantless entry.  *See id.* ("Circumstances deliberately created by the police themselves cannot justify a warrantless search.").  But, as the First Circuit pointed out in *United States v. Cresta*, 825 F.2d 538, 553 (1st Cir. 1987), a "necessary element" to a finding that the government deliberately created the exigent circumstance is that the government controlled the timing.  For example, the argument could obtain where the government through its agents controlled the timing of a drug transaction, yet failed to seek a warrant.  *See United States v. Scheffer*, 463 F.2d 567, 575 (5th Cir. 1972), *cert. denied*, 409 U.S. 984 (1972).  But, here, there is no evidence that the Deputies controlled the timing of this event the way they did in *Scheffer*.  To the contrary, they were called earlier by a neighbor to investigate and, when they arrived, they were confronted by Mr. Buchanan's behavior and reacted to it.

Deputies Hatch and Emerson did not violate the Fourth Amendment with respect to Plaintiff's allegation of illegal entry and are entitled to summary judgment on Count V's claim of illegal entry.  Even if the deputies had violated the Fourth Amendment, however, they would nevertheless be entitled to qualified immunity.  Following is a discussion of the qualified immunity doctrine and its application to the facts of this case.

### 2.  Qualified Immunity and the Warrantless Entry

The doctrine of qualified immunity provides that "the police in their arrest and detention functions are normally 'shielded from liability for civil damages' under federal law insofar as their conduct does not violate 'clearly established' rights of which 'a reasonable person would have known.'"  *Ringuette v. City of Fall River*, 146 F.3d 1, 5 (1st Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  This immunity extends "so broadly that 'all but the plainly incompetent or those who knowingly violate

the law'" enjoy its protection.  *Hegarty*, 53 F.3d at 1373 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), in turn quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Courts are directed to take a three-step approach to assess a claim of qualified immunity.  First, they must determine whether "the facts alleged show the officer's conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Savard v. Rhode Island*, 338 F.3d 23, 27 (1st Cir. 2003).  Then, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" at the time of the constitutional violation.  *Saucier*, 533 U.S. at 201; *Hope*, 536 U.S. at 739-41; *Anderson v. Creighton*, 483 U.S. 635, 638-40 (1987); *Savard*, 338 F.3d at 27.  "The final question is whether a reasonable official, situated similarly to the defendant(s), would have understood that the conduct at issue contravened the clearly established law."[23]  *Savard*, 338 F.3d at 27 (citing *Saucier*, 533 U.S. at 202).

The qualified immunity inquiry should be resolved, whenever possible, before trial, see *Roy*, 42 F.3d at 694 (citing *Hunter*, 502 U.S. at 224), because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  "The privilege is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'"  *Saucier*, 533 U.S. at 200-01 (quoting *Mitchell*, 472 U.S. at 526) (emphasis in original).  Moreover, the qualified immunity inquiry "requires no factfinding, only a ruling of law strictly for resolution by the court," and "even expert testimony relating to appropriate police procedures in the circumstances

---

[23] To prevail on the qualified immunity analysis, all three inquiries must be decided in the Plaintiff's favor. *See Savard*, 338 F.3d at 27.

confronting the officers may not afford certain insulation against summary judgment in the 'qualified immunity' context." *Hegarty*, 53 F.3d at 1373-74 (internal citations omitted).

This broad protection from civil liability is a by-product of policy considerations regarding police conduct and the judicial role in assessing it. *See Hegarty*, 53 F.3d at 1372-73. As the Supreme Court made clear:

> [w]hen government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.

*Anderson*, 483 U.S. at 638 (quoting *Harlow*, 457 U.S. at 814); *see Hegarty*, 53 F.3d at 1372-73.

### a. Step One:  Whether the Defendants Violated a Constitutional Right

The first step of the qualified immunity analysis is to determine whether "the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. This Court has concluded the Defendants did not violate Mr. Buchanan's constitutional rights and therefore, on that basis alone, they are entitled to qualified immunity. However, to complete the qualified immunity analysis, this Court will assume *arguendo* that the Defendants' search amounted to a constitutional violation and turns to the next two steps.

### b. Step Two:  Whether the Law Was Clearly Established

The second step of the qualified immunity analysis is "whether the law was clearly established prior to" the violation. *Savard*, 338 F.3d at 27. Plaintiff correctly contends the Fourth Amendment to the United States Constitution prohibited a

warrantless entry into Mr. Buchanan's home to effect arrest or protective custody except in exigent circumstances and with probable cause.  *See Welsh*, 466 U.S. at 749; *Payton*, 445 U.S. at 586; *Hegarty*, 53 F.3d at 1373; *Buenrostro v. Collazo*, 973 F.2d 39, 43 (1st Cir. 1992).  Deputies Hatch and Emerson are deemed to have been on notice of the relevant constitutional protections constraining their actions.  *Burns v. Loranger*, 907 F.2d 233, 235-36 (1st Cir. 1990).

### c.   Step Three:  Whether a Reasonable Officer Would Have Understood His Conduct Contravened Clearly Established Law

The third and final step in the qualified immunity analysis requires the Court to determine "whether a reasonable official, situated similarly to the Defendant(s), would have understood that the conduct at issue contravened the clearly established law." *Savard*, 338 F.3d at 27.  This inquiry affords the Defendants protection from liability if "an *objectively* reasonable officer, similarly situated, *could have believed* that the challenged police conduct did *not* violate [Mr. Buchanan's] constitutional rights." *Hegarty*, 53 F.3d at 1373 (citing *Burns*, 907 F.2d at 236) (emphasis in original).  In other words, the third step prevents qualified immunity from hinging on the constitutionality of the warrantless entry; rather, it "allows as well for the inevitable reality that 'law enforcement officials will in some cases reasonably but mistakenly conclude that [their conduct] is [constitutional], and . . . that . . . those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable.'" *Id.* (quoting *Anderson*, 483 U.S. at 641) (emphasis omitted).

The Deputies argue their actions were authorized by Maine law:

If a law enforcement officer has reasonable grounds to believe, based on probable cause, that a person may be mentally ill and that due to that condition the person presents a threat of imminent and substantial physical

> harm to that person or to other persons . . ., the law enforcement officer:
> (A) May take the person into protective custody . . . ."

34-B M.R.S.A. § 3862(1)(A).  On these facts, the Deputies would have had reasonable grounds to believe the statutory criteria were met:  (1) that Mr. Buchanan was mentally ill; and, (2) after he had threatened to kill them, had thrown liquid at them, spit at them, and broken glass, injuring his hand, he posed a threat of imminent physical harm to himself or others.[24]

The question is whether in exercising this statutory authority an objectively reasonable official could have believed that entering Mr. Buchanan's house would not violate his constitutional rights.  *Hegarty*, 53 F.3d at 1373.  First, there is nothing on the face of the statute that limits the location of the person to be taken into protective custody.  Second, no case law has interpreted § 3862 to limit its application in these circumstances.  Third, the Deputies acted spontaneously after a series of events culminating when Mr. Buchanan came toward them, displayed a bloody hand, spit at one of them, and ran back into his residence, leaving the door ajar.  This Court concludes the Deputies could reasonably have believed they were within their statutory authority when they acted to take Mr. Buchanan into protective custody.

Moreover, even when viewed in a light most favorable to the Plaintiff, the constitutional violation, assuming it occurred, would not have been obvious.  At best, it would be a close call.  As the First Circuit has acknowledged, the "governing case law under the Fourth Amendment does not yield very many bright line rules.  This is not surprising since the ultimate touchstone is one of reasonableness . . . ."  *Joyce v.*

---

[24] Of course, the Maine statute could not "'authorize a violation of the Constitution.'"  *United States v. Brignoni-Ponce*, 422 U.S. 873, 877 (1975) (quoting *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973)); *United States v. Dusablon*, 534 F. Supp. 1368, 1374 (D. Me. 1982).

*Tewksbury,* 112 F.3d 19, 22 (1st Cir. 1997) (en banc) (per curiam). Here, the Deputies were compelled by the circumstances to make an immediate and instinctive decision about whether Mr. Buchanan posed the type of risk sufficient under Supreme Court and First Circuit authority to allow a warrantless entry and seizure. Whether in the deliberative calm of post hoc judicial decision-making, these facts matched the holding of *Minnesota v. Olsen*, 495 U.S. 91, 100 (1990) and its progeny, is not the question. The question is whether the officers could have believed they were constitutionally entitled to do what they did.

This Court concludes that based on the cumulative circumstances, an objectively reasonable officer "*could have believed*" that exigent circumstances obviated the need for a warrant. *Hegarty*, 53 F.3d at 1373 (emphasis in original). A plain reading of the authorizing statute and the absence of any clear constitutional violation lead to the conclusion that an objectively reasonable officer in similar circumstances could have believed that entering Mr. Buchanan's house did not contravene "the clearly established law." *Savard*, 338 F.3d at 27. In light of this analysis, this Court concludes that Deputies Hatch and Emerson would have been entitled to qualified immunity with respect to Plaintiff's allegation of illegal entry even if it had determined the warrantless search was unconstitutional.

### 3.  The Fourth Amendment and Deadly Force

Plaintiff alleges that Deputy Emerson and Deputy Hatch used excessive force in violation of 42 U.S.C. § 1983 and the Fourth Amendment during their attempt to "seize" Mr. Buchanan on February 25, 2002. Use of excessive force by a police officer is a constitutional tort, *Wilson v. Mendon*, 294 F.3d 1, 6 (1st Cir. 2002), and "all claims that

law enforcement officers have used excessive force . . . in the course of a[] . . . 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham*, 490 U.S. at 395 (emphasis omitted). A court must carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry*, 392 U.S. at 20-22). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal citation omitted). Reasonableness is an objective standard, see *id.* at 397, and in determining whether Deputy Hatch's actions were objectively reasonable, it must be considered that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

This Court cannot say Deputy Hatch's use of deadly force was unreasonable under the Fourth Amendment. After Mr. Buchanan's confrontation with Defendant Emerson at the door of his residence, Mr. Buchanan retreated into his basement. Followed by Defendant Hatch, Defendant Emerson pursued Mr. Buchanan to take him into protective custody. Mr. Buchanan ascended a set of stairs leading to the main portion of his house and, once there, closed the door behind him. As Defendant Emerson ascended to the top of the stairs, Mr. Buchanan reopened the door through which he had

exited the basement, grabbed Defendant Emerson by the shirt, and proceeded to stab him repeatedly with a knife.  Defendant Emerson implored Defendant Hatch to save him. Defendant Hatch drew his firearm and fired until Mr. Buchanan fell.

It is beyond argument that Defendant Hatch did not use excessive force once confronted with Mr. Buchanan's deadly assault on Deputy Emerson.  *See Garner*, 471 U.S. at 3 (use of deadly force found objectively reasonable when "officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."); *Hegarty*, 53 F.3d at 1375 ("Plaintiff acknowledges that the officers did *not* use excessive force to protect themselves after they forcibly entered the cabin and were confronted by Katherine, with rifle raised.") (emphasis in original); *Roy*, 42 F.3d at 693-96 (no viable § 1983 claim where plaintiff was shot by police after lunging at them armed with knives).  Deputy Hatch was not legally required to stand by and watch Mr. Buchanan seriously injure or kill his fellow officer.

Plaintiff contends that because the Deputies' warrantless entry was unconstitutional, Deputy Hatch's use of deadly force was also unconstitutional.[25]

---

[25] In *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), the Ninth Circuit, commenting on *Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), stated "[w]e held that if the police committed an independent Fourth Amendment violation by using unreasonable force to enter the house, then they could be held liable for shooting the man – even though they reasonably shot him at the moment of shooting – because they 'used excessive force in creating the situation which caused [the man] to take the actions he did.'" *Billington*, 292 F.3d at 1188 (quoting *Alexander*, 29 F.3d at 1366); *but see Drewitt v. Pratt*, 999 F.2d 774, 780 (4th Cir. 1993) (looking only to whether it was reasonable for police officer to shoot in the circumstances as they existed at that moment); *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) ("we scrutinize only the seizure itself, not the events leading to the seizure"); *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992) ("[P]re-seizure conduct is not subject to Fourth Amendment scrutiny."); *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991) (pre-shooting conduct is "not relevant and [is] inadmissible").  Consistent with *Garner*, 471 U.S. at 89, the First Circuit adopted a "totality of the circumstances" analysis, allowing an examination of the "actions of the government officials leading up to the seizure," *St. Hilaire v. City of Laconia*, 71 F.3d 20, 26 (1st Cir. 1995) (discussing *Brower v. Inyo*, 489 U.S. 593 (1989)), and not focused solely on the "moment of the shooting." *Id.* at 27; *see Young v. City of Providence*, 404 F.3d 4, 22 (1st Cir. 2005) (holding that "the [district] court did not abuse its discretion in instructing the jury that 'events leading up to the shooting' could be considered by it in determining the excessive force question.").

However, this Court has already concluded that the Deputies did not violate the Fourth Amendment in connection with their entry into Mr. Buchanan's home and to the extent Plaintiff's argument is premised on the unconstitutionality of their entry, this Court's ruling on this issue is subsumed under its ruling on the warrantless entry.

Deputies Hatch and Emerson are entitled to summary judgment on Count V's claim of excessive force.[26]

### D.  Count III:  42 U.S.C. § 1983 Claim Against Defendant Lincoln County

In Count III of the Third Amended Complaint, Plaintiff asserts a 42 U.S.C. § 1983 claim against Defendant Lincoln County.  *Third Amend. Compl.* ¶¶ 68-73.  Plaintiff alleges Lincoln County is liable on two grounds:  (1) the County practices an unconstitutional custom or policy; and, (2) the County has failed to provide adequate training to its deputy sheriffs for encounters with mentally ill or barricaded persons.[27]  *Id.*

#### 1.  Unconstitutional Custom or Policy

Plaintiff alleges that Lincoln County, acting according to established custom and policy, intentionally deprived Mr. Buchanan of his Fourth Amendment rights.  Under § 1983, a claim against a municipality cannot be based on a *respondeat superior* theory of liability.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("*Respondeat superior* or

---

[26]  Because this Court concludes Defendant Hatch's actions were constitutional under the Fourth Amendment, it does not reach the qualified immunity analysis in connection with Plaintiff's claim of excessive force.

[27]  Again, Plaintiff's allegation against Lincoln County assumes the Deputies' actions violated the Fourth Amendment.  Because this Court has concluded their actions passed constitutional muster, this claim fails on that basis alone.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986) (per curiam) (holding that where the defendant police officer "inflicted no constitutional injury . . ., it is inconceivable that [the city] could be liable"); *Young*, 404 F.3d at 26 ("The finding that [defendant] violated [plaintiff's] constitutional rights is necessary for any finding that the City is liable . . . ."); *Wilson*, 294 F.3d at 6 (where defendant police officers have "inflicted no constitutional harm, neither the municipality nor the supervisor can be held liable"); *Hayden v. Grayson*, 134 F.3d 449, 456 n.13 (1st Cir. 1998) ("If Grayson never violated plaintiffs' constitutional rights in the first instance, it is difficult to see how a failure to train him could have *caused* any 'constitutional injury' to plaintiffs.") (emphasis in original).  However, this Court will complete the analysis, because Mr. Buchanan's claim fails even if the search and seizure violated the Fourth Amendment.

vicarious liability will not attach under § 1983."); *Monell v. NY. City Dep't of Soc. Servs.,* 436 U.S. 658, 694-95 (1978); *Fabiano v. Hopkins,* 352 F.3d 447, 452 (1st Cir. 2003). Rather, "a plaintiff seeking to impose liability on a municipality under § 1983 . . . [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 403 (1997); *Burrell v. Hampshire County,* 307 F.3d 1, 10 (1st Cir. 2002) ("direct causal link"). To be attributable to a municipality, a custom "must be so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir. 1989). The custom must be the "moving force behind the deprivation of constitutional rights." *Id.*

Turning to the *Canton* analysis, the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." 489 U.S. at 385. What is the policy or custom that Plaintiff claims caused the constitutional deprivation? The County Defendants posed that very issue in their motion.[28] Plaintiff responded solely by discussing a failure to train, but omitted mention of any custom or practice at all, much less one "so well-settled and widespread that the policymaking officials of the [County] can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro,* 871 F.2d at 1156. There is simply no evidence that the alleged failure to train constituted a well-settled and widespread custom or practice; for example, that others had been subjected to illegal entries, that persons with mental

---

[28] Part C, § 1 of Defendants' Motion is captioned: "There is no evidence of a custom or practice which would be the basis for liability under 42 U.S.C. § 1983." *Defendants' Motion for Summary Judgment* (Docket # 81) (DMSJ) at 15.

illnesses had been subject to improper treatment by the Sheriff's Department, or that any written or unwritten County procedure was defective. Based on this record, this Court cannot even begin the *Canton* analysis and Mr. Buchanan's attempt to premise County liability on an illegal custom or policy fails for lack of evidence.

### 2. Failure to Train

Plaintiff argues the County's failure to adequately train its officers to effectively communicate with and respond to mentally ill persons resulted in the deputies' warrantless entry of Mr. Buchanan's home.[29] "The liability criteria for 'failure to train' claims are exceptionally stringent." *Hayden*, 134 F.3d at 456. "Only if the failure to train 'amounts to *deliberate indifference* to the rights of persons with whom the police come into contact,' and is 'closely related' to, or 'the moving force' behind, the constitutional injury, can the claim against the municipality prevail." *Id.* (quoting *Canton*, 489 U.S. at 388-89) (emphasis in original). A "'single incident' of misconduct," without more, "cannot provide the basis for municipal liability under § 1983" because such a result would be tantamount to "imposing *respondeat superior* liability upon the municipality." *Bordanaro*, 871 F.2d at 1161 n.8; *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) ("one act is not itself a custom").

To establish deliberate indifference, Plaintiff must "present evidence that (1) the [County] knew when it hired" Deputies Hatch and Emerson that the risk of Fourth Amendment violations "arising and recurring" in their dealings with mentally ill persons

---

[29] Defendants argue that where police officer defendants are entitled to qualified immunity, municipal liability premised on insufficient training is precluded. This argument is incorrect. *See Joyce v. Town of Tewksbury*, 112 F.3d 19, 23 (1st Cir. 1997) ("[I]t is not impossible for a municipality to be held liable for the actions of lower-level officers who are themselves entitled to qualified immunity."); *Walker v. Waltham Hous. Auth.*, 44 F.3d 1042, 1047 (1st Cir. 1995) ("[A] municipality might in rare cases be liable for a constitutional violation, even though the individual who acted for it was protected by qualified immunity.").

was "'so obvious' that its failure to train [them] therein likely would result in continued violations; *or*, (2) even though the initial risk of recurring [Fourth Amendment] violations" in the deputies' dealings with mentally ill persons "was not 'so obvious,' the [County] subsequently learned of a serious recurrence, yet took no action to provide the necessary training." *Hayden*, 134 F.3d at 456 (citing *Canton*, 489 U.S. at 390 & n.10) (emphasis in original).

Plaintiff contends the County is liable for failure to train under the above-articulated "deliberate indifference" standard. This Court disagrees. There is no evidence that when Deputies Hatch and Emerson were hired there was a need for increased training in proper methods for making warrantless arrests or, more specifically, for engaging mentally ill and potentially combative persons. Additionally, Plaintiff does not present any evidence of a recurrence that required the County to provide its officers with increased training. Plaintiff points only to this single incident as the basis for municipal liability. Under the law, absent more, that is not enough. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bordanaro*, 871 F.2d at 1161 n.8.

Moreover, the record reflects that Lincoln County provided training for Deputies Hatch and Emerson. They received general training and certification at the Maine Criminal Justice Academy and more specific training on dealing with deviant behavior and mentally ill persons. In fact, in December 2001, just months before this incident, Lincoln County had required Deputies Hatch and Emerson to take written and oral tests

to confirm their familiarity with its policies and procedures, specifically including its policies on how to respond to deviant behavior. Mr. Buchanan's claim must be premised not on a complete absence of training, but on inadequate training.

Under *Canton*, inadequate training can provide the basis for a § 1983 action, where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and where "the identified deficiency in [the government's] training program . . . [is] closely related to the ultimate injury." 489 U.S. at 388, 391; *Young*, 404 F.3d at 26. But, *Young* cautioned that "the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Id.* at 27. Here, Mr. Buchanan has produced no expert or other evidence whatsoever from which this Court could draw the conclusion that the Deputies' training was deficient, much less that its deficiency was so profound the County could be deemed to have been deliberately indifferent.[30]

The First Circuit stated, however, that "'[t]he Supreme Court has left open the possibility that a failure-to-train claim can succeed without showing a pattern of previous constitutional violations.'" *Young*, 404 F.3d at 28 (quoting *Swain v. Spinney*, 117 F.3d 1, 11 (1st Cir. 1997)); *see Brown*, 520 U.S. at 409. "[L]iability without such a pattern will

---

[30] *Young* cites *Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997), an opinion by Judge Manion, addressing a not dissimilar situation. *Young*, 404 F.3d at 27. In *Palmquist,* Paul Palmquist began acting strangely, screaming obscenities and incoherent statements, throwing things in his apartment, stomping around his yard, and breaking his neighbor's windows. 111 F.3d at 1334. He threatened to kill the paper deliverer. *Id.* The police were called and found Mr. Palmquist in his yard, shouting wildly, brandishing a muffler pipe and a fan blade. *Id.* He defied the officers' requests to calm down and drop his weapons and told them they would have to kill him. *Id.* When they approached to arrest him for breaking the windows, he swung a pipe at one of them, striking him. *Id.* Another officer fired numerous shots and killed Mr. Palmquist. *Id.* In *Palmquist,* the Seventh Circuit reversed the finding of municipal liability based on a failure to train. *Id.* at 1347. The Court rejected the Plaintiff's assertion that the municipality was liable because it had failed to provide special training on the handling of abnormally behaving individuals. *Id.* at 1344-45 ("The estate's argument boils down to 'no special training = deficient training.' We cannot accept this equation."); *see Grazier v. City of Philadelphia*, 328 F.3d 120, 125 (3d Cir. 2003); *Pineda*, 291 F.3d at 332-34.

30

be appropriate 'in a narrow range of circumstances,' where 'a violation of [a] federal right[]' is 'a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Young*, 404 F.3d at 28 (quoting *Brown*, 520 U.S. at 409).   *Young* cites a failure to train officers on the constitutional limitations on the use of deadly force when seeking to arrest fleeing felons. *Id.* (quoting *Canton*, 489 U.S. at 390 & n.10); *see Allen v. Muskogee*, 119 F.3d 837, 843-44 (10th Cir. 1997), *cert. denied*, 522 U.S. 1148 (1998) (expert testimony that city trained its officers to approach armed suicidal, emotionally disturbed individuals and try to disarm them could constitute a failure to train without a pattern of previous violations); *but see Robles v. City of Fort Wayne*, 113 F.3d 732, 735-36 (7th Cir. 1997) (failure to train officers that relevant constitutional standards do not change when they perform off-duty work is insufficient without a pattern of similar violations).

*Allen* is a useful counterpoint.  Terry Allen left home the morning of February 20, 1994 after an argument with his wife and children.  119 F.3d at 839.  He took ammunition and several guns and parked in front of his sister's residence in Muskogee. *Id.*  The Muskogee Police Department was informed that Mr. Allen was armed and had threatened family members.  *Id.*  They later learned from Mr. Allen's sister that he was threatening suicide.  *Id.*  After the police officers arrived, they approached Mr. Allen's vehicle to disarm him.  *Id.*  Mr. Allen reacted by pointing a firearm at the officers and was shot and killed.  *Id.*

In the ensuing § 1983 action, the plaintiff produced evidence that the police in Muskogee repeatedly deal with mentally ill or emotionally disturbed and armed individuals, a "usual and recurring situation," and introduced expert testimony that it was

standard and appropriate law enforcement protocol when confronted with an armed, mentally ill individual for the police to take cover, obtain information, and communicate with the individual, avoiding any aggressive action that could provoke a violent response. *Id.* at 842.   There was also evidence that the defendant officers were adhering to Muskogee training in approaching Mr. Allen and attempting to disarm him, training the expert described as "reckless" and "out of synch with the entire United States in terms of what police are being trained to do." *Id.* at 843.  *Allen* concluded that, in view of this and other evidence, the Plaintiff fell within the "'narrow range of circumstances' . . . under which a single violation of federal rights may be a highly predictable consequence of failure to train officers to handle recurring situations with an obvious potential for such a violation." *Id.* at 845.

Here, the Plaintiff's evidence fails on multiple scores.  There is no evidence in this record as to whether Lincoln County faced situations like Mr. Buchanan's on a "usual and recurring" basis; no evidence what Lincoln County policies and procedures were, much less whether they met appropriate standards; and, no evidence that the police were following or ignoring those standards.  In brief, the Plaintiff's case fails under either the *Bordanaro* recurring or *Young* single incident standards.

Lincoln County is entitled to summary judgment on Count III.

**E.  Count IV:  42 U.S.C. § 1983 Claim Against Defendant William Carter**

In Count IV of the Third Amended Complaint, Plaintiff asserts a 42 U.S.C. § 1983 claim against Defendant William Carter in his individual capacity as the Sheriff of Lincoln County at the time of Mr. Buchanan's death.[31]  *Third Amend. Compl.* ¶¶ 74-82.

---

[31] Plaintiff includes as a defendant in Count IV current Lincoln County Sheriff Todd Brackett in his official capacity.  A § 1983 claim against Sheriff Brackett in his official capacity, however, is no different than a §

The claim is premised on a theory of supervisory liability; Plaintiff alleges that Defendant Carter is liable for (1) failing to make, implement, maintain and/or enforce appropriate policies and practices relating to encounters by his law enforcement officers with mentally ill persons and barricaded persons; and, (2) failing to adequately train the law enforcement officers under his control for encounters with mentally ill persons and barricaded persons.[32] *Id.*

Inadequate training of subordinates may form a basis for a claim against a supervisor under § 1983. *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994). A supervisor may also be liable if he formulates a policy or engages in a practice that leads to a subordinate's violation of the Constitution. *Id.* (citing *Tuttle*, 471 U.S. at 823-24); *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998), *cert. denied*, 525 U.S. 1105 (1999). It is well-settled, however, that "[s]upervisory liability under § 1983 'cannot be predicated on a respondeat [superior] theory, but only on the basis of the supervisor's own acts or omissions.'" *Aponte Matos v. Toledo Davila*, 135 F.3d 182, 192

---

1983 claim against Lincoln County. *See McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (a suit against a state official in his official capacity "is not a suit against the official but rather is a suit against the official's office"); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Monell*, 436 U.S. at 691 n.55; *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 71 (1st Cir. 2002) ("[A] a suit against an officer in his official capacity is 'only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell*, 436 U.S. at 690 n.55). Plaintiff's § 1983 claim against Sheriff Brackett, therefore, meets the same fate as his claim against Lincoln County set forth in Count III.

[32] Because this Court concluded that the Deputies committed no constitutional violation, this claim fails. *See Wilson*, 294 F.3d at 6 (where defendant police officers have "inflicted no constitutional harm, neither the municipality *nor the supervisor* can be held liable") (citing *Heller*, 475 U.S. at 799) (emphasis added); *Aponte Matos v. Toledo Davila*, 135 F.3d 182, 192 (1st Cir. 1998) ("There is supervisory liability only if (1) *there is subordinate liability* . . . .") (emphasis added); *Seekamp v. Michaud*, 109 F.3d 802, 808 (1st Cir. 1997) (denying § 1983 supervisory liability claim "because the behavior of the subordinate . . . officers was reasonable in the circumstances . . . [and therefore] the required predicate – a constitutional violation by the subordinate – cannot be established"); *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.2 (1st Cir. 1996) (citation omitted); *Lipsett*, 864 F.2d at 902 ("we conclude that a state official, sued under section 1983 in his or her official or individual capacity, can be held liable for the behavior of his or her subordinates if (1) the behavior of such subordinates *results in a constitutional violation* . . . .") (emphasis added). However, because the Plaintiff's claim fails even if a constitutional violation occurred, this Court will complete the analysis.

(1st Cir. 1998) (quoting *Seekamp v. Michaud*, 109 F.3d 802, 808 (1st Cir. 1997)).  Courts generally require "a showing that the superior was either a primary actor involved in, or a prime mover behind, the underlying violation."  *Camilo-Robles v. Zapata*, 175 F.3d 41, 43-44 (1st Cir. 1999).  In other words, there must be "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization."  *Id.* at 44.

The First Circuit has indicated that the standard applicable to a § 1983 claim alleging illegal search or seizure differs depending upon whether the defendant is an officer actively engaged in the search or seizure, or a police supervisor who is not present during the search or seizure "but is later alleged to have violated a duty to have trained the officers not to engage in violence which led to another officer's violation of the injured person's rights."  *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 51  (1st Cir. 2005).  The First Circuit explained the difference as follows:

> There are a variety of state actors and a variety of settings within which they act.  A police officer who is actively engaged in a search or seizure . . . is subject to the restrictions of the Fourth Amendment.  Such an officer's actions are evaluated differently than the conduct of a police supervisor who is not on the scene and does not engage in the search or seizure but is later alleged to have violated a duty to have trained the  officers not to engage in violence which led to another officer's violation of the injured person's rights.  There are very different, specific standards applied under the Fourteenth Amendment for such supervisory liability claims, which are different from either the Fourth Amendment or the *Deshaney* [*v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989)] standards.  We made this point in *Wilson v. Town of Mendon*, 294 F.3d 1, 6 (1st Cir. 2002).  *See also Camilo-Robles v. Hoyos*, 151 F.3d 1, 6-7 (1st Cir. 1998); *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581-82 (1st Cir. 1994).

*Torres-Rivera*, 406 F.3d at 51.  A review of the cases cited by the *Torres-Rivera* court in this passage illustrates that the standard applicable to a § 1983 claim brought against a

police supervisor not actively engaged in the search or seizure is "deliberate indifference."[33]   *See Wilson*, 294 F.3d at 6; *Camilo-Robles*, 151 F.3d at 6-7; *Maldonado-Denis*, 23 F.3d at 581-82.

Under the "deliberate indifference" standard, liability will attach to the governmental employer "where its failure to properly train its officers 'amounts to deliberate indifference to the rights of persons with whom the police come into contact,' and where a specific deficiency in training is the 'moving force' behind a constitutional injury.'"   *Wilson*, 294 F.3d at 6 (quoting *Harris*, 489 U.S. at 388-89).   "There is supervisory liability only if (1) there is subordinate liability, and (2) the supervisor's action or inaction was 'affirmatively linked' to the constitutional violation caused by the subordinate."   *Aponte Matos*, 135 F.3d at 192 (citing *Seekamp*, 109 F.3d at 808).   The requisite affirmative link "must amount to 'supervisory encouragement, condonation or acquiescence, or gross negligence amounting to deliberate indifference.'"   *Id.* (quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 902 (1st Cir. 1988)); *see also Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 48 (1st Cir. 1999) (causal connection satisfied where "supervisor knew of, overtly or tacitly approved of, or purposefully disregarded the conduct").   Even absent actual knowledge of the unconstitutional conduct, a supervisor "'may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness.'"   *Camilo-Robles*, 151 F.3d at 7 (quoting *Maldonado-Denis*, 23 F.3d at 582).

Deliberate indifference requires the plaintiff to "show (1) a grave risk of harm, (2) the defendant[] [supervisor's] actual or constructive knowledge of that risk, and (3) his

---

[33] The standard applicable to a § 1983 claim brought against an officer who actively participated in the search or seizure, on the other hand, is "objective reasonableness."   *Graham*, 490 U.S. at 388.

failure to take easily available measures to address the risk." *Id.* (citing *Manarite v. City of Springfield*, 957 F.2d 953, 956 (1st Cir. 1992) (this formulation implies the necessary showing of causation as well as deliberate indifference). The causal link may be established where "there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations."[34] *Maldonado-Denis*, 23 F.3d at 582; *see also Braddy v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998) (widespread abuse sufficient to alert supervisor exists where deprivations are "obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences"). Here, there is no evidence of a pattern of "widespread abuse sufficient to alert a supervisor to ongoing violations,"[35] *Maldonado-Denis*, 23 F.3d at 582, and the claim fails under this means of proof.

Even assuming the warrantless entry was a constitutional violation, Plaintiff has presented no evidence of supervisory indifference to the proper police training of Deputies Hatch and Emerson, let alone a level of indifference sufficient to sustain § 1983 supervisory liability. *See Sanchez v. Alvarado*, 101 F.3d 223, 229 (1st Cir. 1996) (mere laxity insufficient to establish § 1983 supervisory liability). To the contrary, both subordinate defendants received training on the Lincoln County Sheriff's Department

---

[34] Under First Circuit law, however, "isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference." *Maldonado-Denis*, 23 F.3d at 582 (citations omitted).

[35] Plaintiff does not allege Sheriff Carter affirmatively formulated policies that led the Deputies to violate Mr. Buchanan's constitutional rights. Instead, the Third Amended Complaint alleges a failure to make and enforce appropriate policies, to train his subordinates, to provide clear and effective policies, and to provide effective supervision. *Third Amend. Compl.* ¶¶ 77-80. The Plaintiff's claim is premised on alleged failures to act, not on allegedly deficient affirmative acts. The failure to act, however, can provide a basis for liability. *Maldonado-Denis*, 23 F.3d at 582 ("[A] supervisor may be held liable for what he does (or fails to do) if his behavior demonstrates deliberate indifference to conduct that is itself violative of a plaintiff's constitutional rights."); *Figueroa v. Aponte-Roque*, 864 F.2d 947, 953 (1st Cir. 1989) (supervisor can be held liable "on the basis of [his] own acts *or* omissions") (emphasis added).

Policies on the Use of Force and Response to Deviant Behavior, see DSMF ¶ 45, as well as training on how to handle individuals with mental illnesses.[36] DSMF ¶¶ 46-47.

Plaintiff has adduced no evidence that, prior to the incident in question, the subordinate defendants – or any other Lincoln County deputies – were ever the subject of any complaints involving mentally ill persons, much less a complaint involving an alleged violation of constitutional rights.[37]  Without such evidence, this Court cannot conclude Defendant Carter ignored a "grave risk" that harm would occur absent additional training on effective procedures for dealing with the mentally ill.  *See, e.g.,* *Camilo-Robles*, 151 F.3d at 7 (notice of behavior likely to result in the violation of constitutional rights "is a salient consideration in determining the existence of supervisory liability"); *Maldonado-Denis*, 23 F.3d at 582 (isolated instances of unconstitutional conduct are usually insufficient to create supervisory liability); *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 93-94 (1st Cir. 1994) (five prior complaints against officer, which stemmed from incidents completely unrelated to the incident at bar, could not have alerted supervisor to fact that officer had propensity to assault citizens, deny detainees necessary medical treatment, or deal inappropriately with mentally handicapped persons).

---

[36] Although Plaintiff disputes the adequacy of the subordinate defendants' training on mentally ill persons, he does not contend they did not receive the training.

[37] In *Pena v. Leombruni*, 200 F.3d 1031 (7th Cir. 1999), responding to a similar issue, Judge Posner wrote:
> Circumstances can alter cases.  If Winnebago County had seen a rash of police killings of crazy people and it was well understood that these killings could have been avoided by the adoption of measures that would adequately protect the endangered police, then the failure to take these measures might, we may assume without having to decide, be found to manifest deliberate indifference to the rights of such people.  But the plaintiffs made no effort to establish the premises of such an argument.

*Id.* at 1033-34 (internal citations omitted).

Defendant Carter is entitled to summary judgment as to Count IV.[38]

## F.  Count VII:  42 U.S.C. § 12132 Claim Against Lincoln County

In Count VII of the Third Amended Complaint, Plaintiff asserts a Title II of the Americans with Disabilities Act (ADA) claim against Lincoln County.[39]  *Third Amend. Compl.* ¶¶ 97-103.  The gist is that Lincoln County violated Title II of the ADA when it failed to reasonably accommodate Mr. Buchanan's disability when attempting to take him into protective custody.   Plaintiff asserts Lincoln County's failure to modify its policies, procedures, customs and/or practices to reasonably accommodate Mr. Buchanan resulted in his death.  *Id.* ¶ 102.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The statute defines a "public entity" as "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  *Id.* § 12132(1)(B).  To establish a violation under the ADA, Mr. Buchanan must demonstrate that:  (1) he is a "qualified individual" with a disability;[40] (2) the defendant is subject to the ADA; and, (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise

---

[38] Because this Court finds Defendant Carter not substantively liable under Plaintiff's theory of supervisory liability, it does not reach qualified immunity.

[39] Although the First Circuit has not addressed the issue, it appears that the ADA's "agent clause" does not subject the employer's agents to liability.  *See Ms. K v. City of South Portland*, No. Civ. 04-275-P-S, 2006 WL 13199, at *9 n.3 (D. Me. Jan. 3, 2006); *Vincent v. Town of Scarborough*, No. Civ. 02-239-PH, 2003 WL 22757940, at *23 (D. Me. Nov. 20, 2003); *Lavin v. Trezza*, No. Civ. 01-135-P-C, 2002 WL 57247, at *4 (D. Me. Jan. 15, 2002);  *Gough v. E. Me. Dev. Corp.*, 172 F. Supp. 2d 221, 224-25 (D. Me. 2001) (collecting cases).

[40] As a person with a psychiatric diagnosis of "bipolar disorder with psychosis versus schizoaffective disorder vs. schizophrenia, paranoid type," Mr. Buchanan met this requirement.  *See* DSMF ¶ 5; PODSMF ¶ 5.

discriminated against by the defendant, by reason of his disability. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003), *cert. denied*, 541 U.S. 936 (2004).

Federal courts "have recognized two distinct types of disability discrimination claims arising out of arrests":

> The first is that police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity. The second is that, while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

*Vincent v. Town of Scarborough*, No. Civ. 02-239-PH, 2003 WL 22757940, at *24 (D. Me. Nov. 20, 2003) (unpublished opinion) (quoting *Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999)); *see Crocker v. Lewiston Police Dep't*, No. 00-13-PC, 2001 WL 114977 (D. Me. Feb. 9, 2001) (unpublished opinion).

Judge Hornby of this Court addressed a classic example of the first type of discrimination in *Jackson v. Inhabitants of Sanford*, Civ. No. 94-12-P-H, 1994 WL 589617 (D. Me. Sept. 23, 1994) (unpublished opinion), when the police mistook the sequelae of Plaintiff's stroke for operating under the influence and arrested him. *See Lewis v. Truitt*, 960 F. Supp. 175, 178-79 (S.D. Ind. 1997) (arresting officers allegedly arrested man because he did not respond to officers appropriately when they knew or should have known that the man could not hear). Here, there is no evidence that the Lincoln County Deputies mistook Mr. Buchanan's actions for criminal activity. Instead, they recognized that he was mentally ill and, pursuant to their statutory authority, were acting to take him into protective custody. As Magistrate Judge Cohen wrote in *Vincent*, "one can only reasonably conclude that the officers trained their weapons on Levier

because he was carrying a high-powered rifle in a crowded shopping plaza - not because of misperceptions stemming from his disability." 2003 WL 22757940, at *24. Here, after being confronted with Mr. Buchanan's bizarre behavior, the Deputies were attempting to secure his person to protect him and others, because of his actions related to his disability, not because of their misperceptions stemming from his disability. By its own terms, the first type of discrimination does not apply.

The second type of discrimination is a denial of proper police protection and fair treatment because of his disability. This type of discrimination does not apply, however, until the exigent circumstances have dissipated. The Fifth Circuit observed in *Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000), *cert. denied*, 531 U.S. 959 (2000), that the duty to reasonably accommodate does not come into play until the area is secure and there is no threat to human safety. "We are not persuaded that requiring Allison and other similarly situated officers to use less than reasonable force in defending themselves and others, or to hesitate to consider other possible actions in the course of making such split-second decisions, is the type of 'reasonable accommodation' contemplated by Title II." *Id.* at 801-02; *see Vincent*, 2003 WL 22757940, at *25. *Hainze* explained:

> Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents.

207 F.3d at 801.

The Fifth Circuit's approach has been followed by other courts, including the District of Maine. *See Sallenger v. City of Springfield*, No. 03-3093, 2005 WL 2001502,

at *31 (C.D. Ill. Aug. 4, 2005) (unpublished opinion) ("Any requirement to accommodate [plaintiff's mental] disability during the course of his arrest would only come into play once the exigent circumstances surrounding the struggle ceased."); *Sudac v. Hoang*, 378 F. Supp. 2d 1298, 1306 (D. Kan. 2005) ("Title II of the ADA . . . did not apply while the officers attempted to disarm [the plaintiff] and otherwise secure the scene"); *Hogan v. City of Easton*, No. 04-759, 2004 WL 1836992, at *7 n.3 (E.D. Pa. Aug. 17, 2004) (unpublished opinion) (finding a claim under Title II because the situation was secure when the officers arrived on the scene); *Vincent*, 2003 WL 22757940, at *25 (exigent circumstances preclude Title II claim); *McCray v. City of Dothan*, 169 F. Supp. 2d 1260, 1275 (M.D. Ala. 2001) (finding it *per se* reasonable "to disregard a suspect's disability until overriding concerns of public safety are ensured."), *aff'd in part and rev'd in part on other grounds*, No. 01-15756, 2003 WL 23518420 (11th Cir. Apr. 24, 2003).[41]

---

[41]    In *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232 (M.D. Pa. 2003), the court concluded the failure of a municipality to adequately train its police officers to peacefully respond to persons with disabilities was actionable under Title II of the ADA. In that case, police officers shot and killed the decedent, who was mentally ill, while attempting to involuntarily commit him. *Id.* at 233. In determining that the plaintiff's improper training claim fell within the ambit of the ADA, *Schorr* emphasized the breadth of Title II:

> Although to the lay reader [the language of Title II] may suggest only commonly available and publicly shared accommodations such as parks, playgrounds, and transportation, the Act in no way limits the terms 'services, programs, or activities' and appears to include all core functions of government. Among the most basic of these functions is the lawful exercise of police powers, including the appropriate use of force by government officials acting under the color of law.

*Id.* at 235.

   *Schorr* noted that the Third Circuit held that Congress intended the terms "program" and "activity," as used in Title II of the ADA, to be "all-encompassing." *Yeskey v. Commonwealth of Pa. Dep't of Corrections*, 118 F.3d 168, 170 (3d Cir. 1997), *aff'd*, 524 U.S. 206 (1998). The court cited a number of cases, including two from the District of Maine, in which courts have determined that the ADA was applicable in the context of an arrest. *See, e.g., Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), *rev'd on other grounds*, 536 U.S. 181 (2002) (finding that police department fell within the ADA definition of "public entity" and that a man injured while being transported to the police station after his arrest could pursue a claim under the ADA); *Calloway v. Glassboro Dep't of Police*, 89 F. Supp. 2d 543 (D.N.J. 2000) (ADA applicable where deaf person was subjected to police investigative questioning without the assistance of a qualified interpreter); *Barber v. Guay*, 910 F. Supp. 790, 802 (D. Me. 1995) (plaintiff's claim "that he was denied proper police protection and fair treatment due to his psychological and alcohol problems" during investigation and arrest was actionable under the ADA); *Jackson*, 1994 WL 589617, at *6 (municipal defendant's contention that the ADA is inapplicable to arrests was "plainly wrong").

This Court concludes Plaintiff's ADA claim against Lincoln County fails as a matter of law under either the misperception during arrest theory or the failure to accommodate during investigation and arrest theory. *See Thompson v. Williamson County*, 219 F.3d 555, 558 (6th Cir. 2000) ("if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled").

Lincoln County is entitled to summary judgment on Count VII of the Third Amended Complaint.[42]

## IV.  CONCLUSION

This Court GRANTS the County Defendants' Motion for Summary Judgment (Docket # 81) on Counts III, IV, V, VII, and VIII of the Third Amended Complaint.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE


Dated this 16th day of February, 2006

---

*Schorr* distinguished *Hainze* by noting that its "exigent circumstance" analysis did not apply because "Plaintiffs have not brought this action against any of the officers involved, nor are they challenging the degree of force used by the officers, and any exigent circumstances at the time of arrest are therefore irrelevant." *Schorr*, 243 F. Supp. 2d at 238. In the current case, however, Plaintiff has filed claims against the officers involved and challenged their use of force. There were exigent circumstances present during the struggle between Mr. Buchanan and Deputy Emerson – most notably, the serious risk to the life and safety of Deputy Emerson himself. Therefore, under the circumstances present in this case, this Court finds the *Hainze* analysis more applicable and more compelling.

[42] Because this Court grants summary judgment in favor of the County Defendants on all substantive claims against them, they are likewise entitled to summary judgment on Count VIII of the Third Amended Complaint, which seeks punitive damages.